GOODWIN CREASON, Administering Surviving Partner of Partnership Firm of DEATHERAGE & CREASON, Appellant, v. W. N. DEATHERAGE, Executor of Last Will of B. F. DEATHERAGE, ET AL.; JOHN T. HARDING, DAVID A. MURPHY and PAUL R. STINSON, Appellants.—30 S. W. (2d) 1.

Division Two, June 11, 1930.

*Gossett, Ellis, Dietrich & Tyler* for Goodwin Creason, appellant administrator.

*Ryland, Boys, Stinson, Mag & Thomson* and *Harding, Murphy & Tucker* for appellant defendants.

WHITE, J.—The plaintiff, as surviving partner and administrator of the partnership estate of B. F. Deatherage and Goodwin Creason, brings this suit against W. N. Deatherage, executor of the last will of B. F. Deatherage, and against Harding, Murphy & Stinson, attorneys, who later became associated with the cases concerning which an accounting is asked. The demand is for an accounting for attorneys' fees, collected by B. F. Deatherage in his lifetime and by Harding, Murphy & Stinson after his death, in all of which the plaintiff claims he is entitled to share.

The cases out of which the claim grew arose in this way: Cowan & Burney, of Fort Worth, Texas, general attorneys for the Cattle Raisers Association, had filed certain claims before the Interstate Commerce Commission for excessive freight rates, which had been collected by numerous railroads. E. B. Spiller was secretary of that association, the claims were assigned to him, the proceedings were brought in his name, and are designated throughout the record as the Spiller cases. The Interstate Commerce Commission allowed the claims in some form, and the railroad companies refused to pay them. Suits to recover the amounts awarded were filed in Texas by Cowan & Burney, but on account of failure to

obtain service on all the railroads affected, they were dismissed, and suits were filed in December, 1915, in the United States District Court at Kansas City.

Cowan & Burney had a contract with Spiller for a contingent fee of one-third of the amount recovered, less expenses. Before suits were brought in Kansas City, they made an agreement with Deatherage & Creason to pay the latter firm one-third of the one-third that Spiller had agreed upon as the contingent fee. Judgments were obtained in August, 1916, in the District Court of Kansas City, against the several railroads, amounting in the aggregate to $180,000. They were appealed to the Federal Circuit Court of Appeals and reversed by that court October 26, 1917. The decisions were modified in March, 1918. The cases were then taken on certiorari to the Supreme Court of the United States where, May 17, 1920, the judgments of the district court were affirmed.

Creason's relation to the cases began with the employment of Deatherage & Creason. They became partners in January, 1914. After the suits were brought in the Federal District Court at Kansas City, Deatherage and Creason dissolved that partnership, January 1, 1916, before judgments were rendered in favor of the plaintiff Spiller. Deatherage then became the partner of Guthrie, and continued with Guthrie until July, 1917. At that time he entered into partnership with Harding, Murphy & Stinson and continued in that relation until his death, January 21, 1921.

After the cases were reversed in the Circuit Court of Appeals, the attorneys were for some time in doubt as to how further to proceed. Then Mr. Cowan of the firm of Cowan & Burney agreed with Deatherage that he would increase the latter's fee as first agreed on from one-third of the one-third, which Cowan & Burney received, to one-half of that one-third. After the decision of the Federal Supreme Court in favor of the plaintiffs, there was further difficulty in collecting the amount of the judgments against the several railroads. The agreed fees, being for a percentage of the amount recovered, of course, were realized as the judgments were actually paid. Collections were made by Mr. Deatherage during his lifetime against several railroads. It is unnecessary to list them here. Against other railroads, which were in the hands of receivers at the time of his death, nothing had been collected. After the death of Deatherage, Spiller had an agreement with Cowan & Burney to increase their fee from one-third to one-half of the total amount recovered, and Cowan in turn employed Murphy, representing the firm of Harding, Murphy & Stinson, to aid in the collection from the remaining railroads, and agreed to increase the fee which the Kansas City attorneys were to receive from one-

half of the one-third to one-half of the one-half that Cowan & Burney were later allowed.

The plaintiff claims that the contract with Deatherage & Creason in the beginning attached to all the amounts recovered from all the railroads. On the dissolution of the partnership between Deatherage and Creason in January, 1916, they published an announcement which contained this statement: "All unfinished business will receive the attention of both Mr. Deatherage and Mr. Creason." Creason claims that by the terms of their dissolution they continued each with the same interest in the Spiller cases, sharing equally in the fees to be collected as the result of their successful conduct of the cases. It is admitted by the defendants that Deatherage and Creason were equal partners, sharing equally in the remuneration which the firm received. The plaintiff asserts, and the defendants deny, that Creason was entitled to share in the increase of the fees, upon which Cowan agreed with Deatherage after the reversal of the cases in the Circuit Court of Appeals.

The plaintiff claims further that the contract of Deatherage & Creason with Cowan & Burney applied to all amounts collected and to be collected by Harding, Murphy & Stinson on the judgments against the several railroads after the death of Deatherage. Defendants contend that the firm of Deatherage & Creason were not entitled to share in the fees collected by Harding, Murphy & Stinson after the death of Deatherage because of their new contract with Cowan & Burney.

Creason, on account of Deatherage's death, was not a competent witness to the terms of his dissolution agreement with Deatherage. The only signed statement of the parties relating to it is the passage from the published notice quoted above. But after the dissolution, Deatherage and Creason each kept books relating to their unfinished partnership business, separate from their new business. These books showed that they correspond exactly in most items, except in relation to the fees collected in the Spiller cases. The fees collected were placed in the account upon which they each could draw. Those bank books show that Deatherage had overdrawn his account to the amount of $220.77.

After the Spiller cases were affirmed by the Supreme Court and got back to the district court, that court allowed an additional fee of $25,000 to Spiller's attorneys. The inference is that the amount so allowed was to be apportioned among the several defendant railroad companies.

Deatherage, during his lifetime, after the affirmance in the Federal Supreme Court, received attorneys' fees amounting to $39,-147.77. He remitted one-half of that to Cowan & Burney, leaving $19,153.38 as the half coming to Deatherage & Creason. Of that Creason received $5,086.90.

Creason, after the death of Deatherage, made demand on the administrator of Deatherage for an accounting and also on Harding, Murphy & Stinson. Being unable to obtain such an accounting, he took out letters of administration on the partnership estate of Deatherage & Creason, and then demanded to see the books which Deatherage had kept of the amounts received. The books were turned over to him, but three pages, showing the receipts and disbursements of the Spiller cases, were torn out. It seems that no one knew anything about this except Miss VanDeventer, who was stenographer for Deatherage & Creason while they were in partnership, and later served Harding, Murphy & Stinson in that capacity. She took full responsibility for what she did. She reconstructed those pages, and delivered them as reconstructed to Creason, though he afterwards got hold of the pages as they were originally kept by Deatherage. In that account, in each case where the fee was collected from a railway company, Deatherage took to himself one-third of the amount coming to Deatherage & Creason, and after that placed to the credit of Deatherage & Creason the other two-thirds, or one-third of the one-third which they were to receive from Cowan & Burney according to the original first agreement. As an illustration, one item will suffice:

"By ck. from M. K. & T. on a/c part of cost
in rate cases                                          6663.34
   "To ck to S. H. Cowan $\frac{1}{2}$ of same           3331.67
' "To ck to B. F. D.—Dif. between $\frac{1}{2}$ & $\frac{1}{3}$ of
whole amount in which Creason does not share     1110.56
   "Leaving to Cr. of D & C                  2221.11."

After receiving total fee, it will be seen he sent one-half of it to Cowan, took one-third of the remainder himself, and placed the other two-thirds of the remainder, or one-third of the total, to the joint account of Deatherage & Creason. Several other items are divided up in the same way. His action is explained in this statement by him at the end of the first page which Miss VanDeventer had torn out:

"The original agreement of D & C with S. H. Cowan was for $\frac{1}{3}$ of fee. Afterwards Mr. Cowan voluntarily agreed that Mr. D should have the difference between $\frac{1}{2}$ and $\frac{1}{3}$."

Thus his theory was that Creason was not entitled to share in the increase which he was to receive by his subsequent agreement made with Cowan after the reversal in the Circuit Court of Appeals. Even on his theory, he did not pay Creason all that was due him, because one-third of the $19,153.38 would have been $6,384.46, instead of $5,086.90, which Creason received. Deatherage said nothing to Creason about the agreement to increase the fees with Cowan, and it is quite evident that he did not intend that Creason should know anything about it. Miss VanDeventer re-

flected that intention by attempting to conceal the fact from Creason.

The trial court on the evidence introduced found that Creason was entitled to share with Deatherage in the increase from one-third to one-half, as agreed upon between Deatherage and Cowan, and that inasmuch as Creason had been paid only $5,086.90, Deatherage was entitled to a like amount, making $10,173.80 in all. That would leave a balance of $9,745.19 due the firm of Deatherage & Creason undistributed and in the estate in the hands of Deatherage's administrator. This with the interest from the time it was received until the judgment amounted to $13,253.45. The court then rendered judgment against the defendant administrator for that sum. The court further rendered judgment in favor of the defendants Harding, Murphy & Stinson, holding that the plaintiff was not entitled to receive any portion of the fees collected by them after the death of Deatherage.

The defendants filed a motion for new trial on account of the judgment rendered in favor of the plaintiff against the administrator of Deatherage, and the plaintiff filed a motion for new trial on account of the finding by the court in favor of the defendants Harding, Murphy & Stinson. Both of those motions for new trial were sustained. Plaintiff appealed from the ruling of the court in sustaining the defendants' motion for a new trial, and the defendants Harding, Murphy & Stinson appealed from the ruling of the court in sustaining the plaintiff's motion for new trial.

There is no disagreement between the parties as to Creason being entitled to one-third of the one-third of the fees, according to the first agreement with Cowan & Burney, so far as those amounts had been collected at the time of Deatherage's death. There is also no disagreement as to Harding, Murphy & Stinson being entitled to all the last increase from one-half of a one-third to a half of a half according to the agreement entered into after the death of Deatherage. The points of disagreement as stated above are: Plaintiff claims, and the defendants deny, that Creason was entitled to one-half the increase from the one-third of the one-third to a half of a one-third, according to the arrangement made by Cowan with Deatherage after the case was reversed in the Federal Court of Appeals. It is also in dispute, plaintiff claiming and the defendants denying, that plaintiff, as administrator of the partnership estate of Deatherage & Creason, is entitled to one-half of a one-third of the total fees collected and to be collected after the death of Deatherage, which would not interfere with the increase agreed upon between Cowan and Murphy. Since this is an equity case, we must examine the facts as to these respective claims.

I. The first question to determine is whether Creason should share equally with Deatherage in the fees.

The defendants assert that, after the reversal of the cases in the Court of Appeals, Cowan engaged Deatherage alone to perform additional service in the future conduct of the Spiller litigation, ▆▆▆ ▆▆▆▆▆▆. and agreed to pay him alone additional compensation, *or* voluntarily agreed to give him the difference between the one-half and one-third of the one-third of Cowan & Burney's fees.

Cowan testified that after the cases were reversed in the Court of Appeals, he came to Kansas City and talked the matter over with Deatherage. He says: "I stated to Mr. Deatherage, after the matter stood reversed by the Court of Appeals, seeing the amount of work that was to be subsequently done and great uncertainty as to results, that I would increase the amount to one-half; that is to say, *he* take half of the contingent recovery and Burney and I the other half." He further stated: "I recall stating to Mr. Deatherage that I was doing that with the expectation, of course, that he would get it if we succeeded finally in the cases, which seemed then very doubtful, because the Court of Appeals decision was squarely against us."

Mr. W. N. Deatherage, the executor, was present at that conversation. He testified that Cowan said to B. F. Deatherage that from then on there would be an immense amount of work which Mr. Deatherage would have charge of absolutely and would have to bear the brunt of responsibility of the future work, and that out of his fee, Cowan was voluntarily going to give Deatherage the difference between the one-third and one-half. Mr. Cowan further said that they did not recognize Mr. Creason in this additional compensation at all; that that was for Mr. Deatherage's own personal account.

The defendants put the right of Deatherage to make this arrangement upon the ground that it was additional business, whereas in fact it was not new business. It was not additional matters that came into the same cases, but the same cases on exactly the same issues which had been pending all the time. The presumption is, when Deatherage & Creason undertook to conduct the cases for a contingent fee based on the amount recovered, that they contracted to carry the cases entirely through to a finish, until judgment was obtained and the judgments collected. The agreement necessarily included all work necessary to that end, whether foreseen or contemplated at the time or not.

If, as the defendants claim, Creason was ignored, dropped out of the cases, abandoned them and rendered no more service, or if the arrangement was treated by both parties as if he were no longer connected with the prosecution of the cases, then a different question would arise. [Henry v. Bassett, 75 Mo. 89.] Instead of being ignored, Creason's name appears upon the briefs filed upon the

petition for rehearing in the Circuit Court of Appeals, and upon the briefs in the Supreme Court, filed at the October Term, 1919, His advice was sought as to the best course to pursue after the reversal by the Court of Appeals in October, 1917. Deatherage wrote to Creason, November 10, 1917, after the reversal, in relation to that, asking the latter's opinion about how to proceed. Creason's reply was a long letter inclosing a brief in which he expounded his theory of the matter.

Mr. Cowan also recognized Creason as important counsel in the case. Creason wrote Cowan & Burney January 18, 1918, after the reversal in the Court of Appeals, in which he spoke of having read two letters from Mr. Burney to Mr. Deatherage of previous date,. and among other things said, "I think it would be the mistake of our lives if we did not take this case up to the Supreme Court," and explained at length his theory as to why it should be done, citing authorities. Mr. Cowan replied to that letter January 22, 1918, and further discussed the matter, mentioning some minor points in regard to what Creason had said. Then he used this language: "Again I urge that you continue to work on this point until, if possible, you arrive at a definite and safe conclusion. You have my superficial, hesitating, and doubtful views, which may be wrong." After he had signed the letter, Mr. Cowan added this: "Later: Have just received and read your reply to Dunlap's audacious but fallacious brief. Like your main brief, this reply is a gem of concise, thorough analysis and briefing. We are going to win!"

This letter of Mr. Cowan shows they did not consider Creason out of the case. It was written three months after the reversal in the Court of Appeals and no doubt after he had agreed with Deatherage to increase the fee from one-third to one-half of the total fee, an increase in which he *now* claims Creason was not to share, because Deatherage was to do all the work thereafter.

One witness, Miss Rose O'Neill, who was Creason's stenographer until December, 1917, testified that she wrote many letters for Creason respecting the case to Cowan & Burney, and that Deatherage frequently came to Creason's office to confer about the Spiller cases. Creason did much research work in the case, and that, during the two years those cases were pending, Creason spent one-fourth of his time on them. So, notwithstanding the testimony of Mr. Cowan and Mr. Deatherage, the administrator of Deatherage's estate, it is apparent that Creason was recognized by Cowan & Burney as actively engaged in the conduct of the cases after the reversal in the Court of Appeals. There was no abandonment by him of the cases, and he was recognized as participating in them until a final affirmance by the Supreme Court.

II.   The defendants make this assertion:

"The law is well settled that after the dissolution of a law partnership, neither partner can bind the other in the matter of new contracts or taking on new responsibilities." Upon that principle defendants base their argument that Creason was not entitled to any portion of the increase of fee made between Mr. Cowan and Mr. Deatherage after the cases had been reversed in the Circuit Court of Appeals.   That statement, however, does not cover the entire subject.   In support of that position the defendants cite cases which are not law partnerships but relate to other kinds of business.   In 20 Ruling Case Law, page 968, the principle is stated in the passage partly quoted by appellant.   It is this:

"The general agency of one partner for his associate ceases when the partnership is terminated, although after dissolution the mutual agency to a certain extent is prolonged until the affairs of the partnership are administered and wound up."

One of the affairs of this partnership of Deatherage & Creason was the Spiller cases, and their relation to those cases under the principle quoted continued as before, until that particular business was brought to an end, or until the death of Mr. Deatherage.

Mr. Cowan further says that the increase of fee to Deatherage was a gratuity, but his own evidence and his letters show that it was remuneration for more work than had been expected, and Creason was urged to assist in that work.

The defendants admit the principle that the profits of a partnership are to be equally divided between the partners, however unequal may be their contributions of services in the case, and that it applies to lawyers in the cases from which their remuneration is received.

Harding, Murphy & Stinson do not claim that they were entitled to share in any way in the fees accruing to Deatherage & Creason, collected before Deatherage's death, except such compensation as Deatherage allowed to that firm on account of the time he spent in the litigation.   From this it is assumed that Deatherage would devote to the firm of Harding, Murphy, Deatherage & Stinson such time as would be proper for him as a member of the firm, and if some of that time was taken up with the Spiller cases, a proper part of the compensation he received from those cases should go to the firm.

If the law did not establish the principle quoted above from Ruling Case Law, that the mutual agency after dissolution continues for certain purposes, the agreement of the parties on their dissolution made the principle apply, for they published the statement:   "All unfinished business will receive the attention of both Mr. Deatherage and Mr. Creason."

All unfinished business does not mean a part of the unfinished business, and the Spiller cases were particularly set apart from the business each was afterwards engaged in, as business to be conducted by the joint efforts of the two. They thereby became what is termed "joint adventurers." While a joint adventure differs in some respects from a partnership, in its effect upon this particular matter the authority of each joint adventurer would be the same as if they were partners.

In Senneff v. Healy, 39 L. R. A. (N. S.) 219, an Iowa case, several attorneys undertook a case on a contingent fee. One of them died during the pendency of an appeal. It was held that his death did not deprive him of an equal share of the fee. The court said, l. c. 221: "There was at all times a joint adventure, which did not amount to a partnership, but it is governed in many respects by the rules applicable to partnerships."

The law does not allow secret profits in a joint enterprise to go to one joint adventurer.

Selwyn & Co. v. Waller, 212 N. Y. 507, L. R. A. 1915B, 160, was a case of employment of two joint adventurers to perform certain personal services as actors. One of the joint contractors afterwards acquired an interest in the enterprise at an advantage to himself. The court said, l. c. 162: "Good faith requires that neither shall make a secret profit out of the undertaking. The rule against secret profits is not limited in its application to cases of agency, trusteeship, and the like, strictly fiduciary relations. Its application to a case like this depends on the reciprocal good faith required of joint adventurers, and more precisely upon the mutual burdens and benefits which the relation necessarily implies are to be shared in the stipulated proportions."

The question of secret advantage to one of two joint adventurers is considered in Lind v. Webber, 50 L. R. A. (N. S.) 1046. Deatherage and Creason on the dissolution of their partnership had no further mutual claims upon each other as partners, but they were in respect to the Spiller cases in the same position as if they had undertaken them in the beginning without being associated as a partnership: each is entitled to one-half of the fees.

Hereford v. Meserve, 272 Fed. 353, is in point, where that court said, l. c. 356: "It has been held that in such a case as this the plaintiff and the defendant are special and limited partners, that in the absence of an agreement to the contrary they are entitled to share equally in the compensation, and the mere neglect on the part of one of them to perform services will not amount to abandonment of the contract." [Citing Henry v. Bassett, 75 Mo. 89, where the same principle is announced.]

In Underwood v. Overstreet, 10 A. L. R. 1352, the principle is discussed at length in an annotation on pages 1357 et seq. The

mutual power and obligations of joint adventurers is considered in 33 Corpus Juris, pages 860, 861.

While it is true after the dissolution of the partnership of Deatherage & Creason, neither could bind the other by contract relating to some new undertaking, that principle is entirely irrelevant here. The undertaking at the beginning was to carry the Spiller cases through to a finish. That is necessarily implied in the stipulation for the contingent fee. They could have no fee on any contingency except the conclusion of the cases and the collection of the judgments. Creason was entitled to share equally with Deatherage in the fees.

III. The plaintiff further demanded an accounting from Harding, Murphy & Stinson for fees collected by them after the death of Deatherage.

When Harding, Murphy & Stinson were inclined to ignore him in the cases, Creason tendered his services to that firm to assist in the collection of the judgments which were not yet collected. Harding, Murphy & Stinson employed to assist them in making the collections from the different railroads, the firm of Leahy & Saunders of St. Louis.

As noted above, after the death of Deatherage, which occurred after he had collected the amounts awarded on several of the judgments, on account of difficulty in collecting the rest, another agreement was made by Cowan with Harding, Murphy & Stinson. Cowan & Burney in the meantime had reached an agreement whereby their fees would be increased to one-half of the total amount recovered. The agreement with Deatherage & Creason stood for one-half of the fee or one-sixth of the total amount recovered. Mr. Cowan in explaining the new agreement with Murphy said: "It was agreed by Mr. Spiller, instead of making the attorneys' fees a third, he would make them the attorneys' fees a half." The half of that half was to go to Murphy's firm, the increase being one-sixth of the total fee. This is stated several times in a manner to indicate that the increase was lumped together as if applying to all the Spiller cases. But it seems understood to apply only to the judgments not yet collected, each case standing on its own bottom. Plaintiffs do not deny that Murphy's firm is entitled to the one-sixth increase as to those cases. But defendants claim the total one-half, which includes the one-third claimed by plaintiff.

Deatherage & Creason reduced *all* the claims to judgment. Deatherage collected some of them and received the agreed fees. In the other cases in which they rendered the same service in reducing them to judgment but failed to collect, the defendants claim Deatherage & Creason are entitled to *no compensation* whatever, although Deatherage & Creason had the same contract with regard to them

as they did with regard to the others. Murphy's firm claim that they are entitled to receive *all* the fees coming to the Missouri attorneys in *those* cases, where the service rendered by them was to collect the judgments which Deatherage & Creason had obtained.

The plaintiff in his brief does not ask for statutory liens upon the judgments. He goes upon the theory that he has an equitable claim by virtue of the *contract* of Cowan & Burney with Deatherage & Creason, which was well known to these particular defendants. The defendants cite a number of cases to the effect that, where an attorney, undertaking a case on a contingent fee, dies before the case is tried, or even before suit is brought, his contract thereby ceases, and if other attorneys are employed to prosecute the case to the finish, the first attorney can recover only in *quantum meruit*. But defendants deny that the firm of Deatherage & Creason are entitled to *any* compensation, in *quantum meruit* or otherwise, for those claims reduced to final judgment by them, because not collected before the death of Deatherage. To the one-third of the total fees on judgments collected by Deatherage as the portion due his firm, *defendants make no objection*. But they say on the death of Deatherage, neither he nor his firm is entitled to his contract fee, or *any* fee, for services rendered in reducing the other claims to judgment. We cannot see consistency in that position.

In pursuance of the arrangement of Deatherage & Creason with Cowan & Burney the cases were carried through all the courts, with many vicissitudes on the way, to final judgments affirmed in the court of last resort. By virtue of that agreement the firm of Deatherage & Creason was entitled to one-sixth of the total amount of those judgments. Whether they had a statutory lien, if they chose to enforce it against the defendants, is unimportant. They had an equitable claim against the fee collected as against their associates or whoever might thereafter prosecute the case.

This view is supported by authorities construing the lien statute, Section 690, Revised Statutes 1919, and the general doctrine in relation to an attorney's rights when he has a contract for a contingent fee. [Mills v. Metropolitan St. Ry. Co., 221 S. W. 1, l. c. 4, 5; Lawson v. Telephone Co., 178 Mo. App. 124, l. c. 132, 133.] In Wait v. Railroad, 204 Mo. 491, l. c. 502, Judge LAMM, in writing the opinion, says: "Where the circumstances are such that the law (possibly) affords no adequate remedy, then an attorney's lien may be established in equity against a resulting fund (the fruitage of the litigation) which may be within reach." That aptly states the rights of the firm of Deatherage & Creason in this case. No authority has been cited and no reason has been advanced for the claim that they were not entitled to the agreed compensation, that is to say, one-sixth interest in those judgments. If they were entitled to it on the sums *collected* while Deatherage was alive, by

what reason could his death have destroyed their claim to compensation for procuring the judgments not collected? If the remaining judgments had been voluntarily paid after the death of Deatherage, could there be any doubt that the administrator of the firm of Deatherage & Creason would have had a right to their percentage of the amount paid in accordance with their contract? The only difference arises because there was difficulty in making the collections, on account of which Spiller agreed to increase the total compensation from one-third to one-half. Cowan & Burney in turn then increased the compensation of the Missouri attorneys in like proportion.

It was proper to employ attorneys to make those collections, and the expense was undertaken by the plaintiff Spiller when he increased the compensation. If Deatherage & Creason, who had conducted the cases up to that point, had joined with Spiller in that agreement they would have to share in the expense of that collection. But Creason, the survivor of the firm, was not consulted; Spiller undertook to bear the cost of the collections. Cowan & Burney did not share in that expense, but received additional compensation for it.

When Cowan agreed with Murphy to increase the fee from one-half of a third to the half of one-half, one-sixth of the total fee, it seems reasonable from the record that such was their measure of the value of the services which Murphy's firm should render in making the collections of those judgments. If Murphy's firm did not so understand it, then they contracted to receive for their services the very money which the original contract showed them was due Deatherage & Creason.

It is not denied that the firm of Deatherage & Creason were entitled to compensation for reducing the original claims to final judgment in the Federal court. How is that firm to recover that compensation? Must they go to Texas and sue Spiller or Cowan & Burney in *quantum meruit?* Their contract, of which these defendants had full knowledge, provided that they must get their fees out of the proceeds of the judgments. These defendants have collected those judgments and have undertaken to dispose of *all* the proceeds, and now deny that plaintiff is entitled to any part of them. Plaintiff's right to an accounting with Murphy and his firm arises on the contract by which Deatherage & Creason were to be paid out of the proceeds of those judgments. If these defendants had desired that the amount to be received by plaintiff on the accounting should be limited to a *quantum meruit* basis, they failed to tender any such issue. They denied at all times that plaintiff administrator of the firm of Deatherage & Creason was entitled to any compensation to be realized out of the judgments which they procured. Plaintiff was not obliged to sue in *quantum meruit.*

He could sue on his contract as he did and recover in *quantum meruit*, if the pleadings and evidence had justified it. But that issue is not and was not in the case.

Murphy's firm paid a fee to the firm of Leahy, Saunders & Walther for services rendered by the latter as stated. Whether that fee was on a percentage basis or a fee certain, the record does not disclose, nor is it shown what proportion of the fee collected by Murphy's firm went to Leahy's firm. Whatever it was the latter firm are not parties to this proceeding, and are not affected by it.

We hold that plaintiff, administrator of the partnership estate of Deatherage & Creason, is entitled to an accounting with the defendant W. N. Deatherage, executor, and adjudge that the latter be ordered to pay to plaintiff all fees collected by B. F. Deatherage in his lifetime for the firm of Deatherage & Creason in the Spiller cases, less the part of the same paid to Creason, and, in addition, a like amount as appropriated by Deatherage, with interest from the time the sums were collected.

We hold also that the partnership estate of Deatherage & Creason, through the plaintiff administrator, is entitled to an accounting with defendants Harding, Murphy & Stinson, of the fees collected by said defendants after the death of B. F. Deatherage, as indicated above.

The judgment of the trial court in sustaining the motions for new trial is affirmed and the cause is remanded with directions to the trial court to proceed in accordance with the conclusions stated above. *Blair, P. J.*, concurs; *Walker, J.*, absent.