GOODWIN CREASON, Administering Surviving Partner of the Partnership Firm of DEATHERAGE & CREASON, Plaintiff and Appellant, v. JOHN T. HARDING, DAVID A. MURPHY and PAUL R. STINSON, Defendants and Respondents.—126 S. W. (2d) 1179.

Court en Banc, April 4, 1939.

454

*Goodwin Creason, A. N. Gossett, Gossett, Ellis, Dietrich & Tyler* and *Lucian Lane* for appellant.

456

*James P. Aylward, Harding, Murphy & Tucker* and *R. C. Tucker* for John T. Harding and David A. Murphy.

*Leslie A. Welch* for Stinson.

CLARK, J.—This is the second appeal of this case, the first being . reported in 325 Mo. 661, 30 S. W. (2d) 1. Creason (plaintiff) and Deatherage were formerly partners in the practice of law. Death- erage died and Creason, as the surviving partner and administrator of the partnership estate, sued the estate of Deatherage and also the law partnership of Harding, Murphy and Stinson, in equity,

for an accounting for attorney fees collected by Deatherage in his lifetime and by Harding, Murphy and Stinson after his death. Since the first appeal plaintiff has compromised his claim against the Deatherage estate and the present appeal concerns his claim against Harding, Murphy and Stinson.

The claim arose in this way: E. B. Spiller, of Fort Worth, Texas, was secretary of the Cattle Raisers Association. Various members of that association assigned to him claims for excessive freight rates collected by numerous railroads. He employed one Cowan of the law firm of Cowan and Burney, Fort Worth, as his general attorney to prosecute said claims. Cowan got the claims allowed by the Interstate Commerce Commission, but the railroads refused to pay and Cowan filed suits in Texas. In December, 1915, these suits were dismissed and new suits filed in the United States District Court at Kansas City. Just prior to the filing of the new suits Cowan employed Deatherage, then a law partner of Creason, to assist in the cases. Trials in the district court in 1916 resulted in judgments for Spiller for large sums, which judgments were reversed by the United States Circuit Court of Appeals in 1917 and 1918. The cases were taken on certiorari to the Supreme Court of the United States where, on May 17, 1920, the judgments of the district court were affirmed. At the trials in the district court, in addition to his judgments for damages, Spiller was given judgments for sums equivalent to ten per cent of the damages for attorney fees, which judgments for attorney fees were increased to approximately fifteen per cent of the damages after the cases came back to the district court from the Supreme Court. The judgments for attorney fees against all the railroads, $21,352.29, and the judgments for damages against all the railroads save three which were in receivership were collected prior to the death of Deatherage which occurred January 20, 1921. The three railroads in receivership, St. Louis and San Francisco Ry., Missouri, Kansas and Texas Ry., and the Missouri Pacific Ry. (the Iron Mountain Ry. having consolidated with the Missouri Pacific), refused to pay the judgments for damages although they were compelled to pay the judgments for attorney fees, at least that part of them which was assessed before the appeal, because taxed as costs and covered by their appeal bonds. As Deatherage made collections he retained his contract proportion of amounts collected as damages and one-half the sums awarded as attorney fees, sending the rest to Cowan.

After the death of Deatherage, to-wit, in February, 1921, Cowan employed Murphy of the firm of Harding, Murphy and Stinson. Later the law firm of Leahy and Saunders was also employed. These attorneys prosecuted actions against the receivership railroads in the Federal courts (district court, Court of Appeals, and Supreme Court) from February, 1921, to November, 1927.

In the beginning, Cowan had an oral contract with Spiller for a

contingent fee of one-third the amount collected. Whether this contract also entitled Cowan to *all* the sums which might be allowed as attorney fees or to only one-third of them is in dispute and will be discussed later. The expenses were to be deducted from Cowan's share.

In December, 1915, Cowan employed Deatherage and agreed that he should have one-third of his (Cowan's) share. Deatherage was then a partner of Creason. Their partnership was dissolved on January 1, 1916, but each partner retained his interest in the Spiller fees and there is no dispute that Creason was entitled to one-half of all sums coming to Deatherage under his first agreement with Cowan. On July 1, 1917, Deatherage became a member of the firm of Harding, Murphy, Deatherage and Stinson, but did not take the Spiller cases into the new firm except that he made an allowance to it out of his part of the Spiller fees. About October, 1917, and before any collections were made, Cowan and Deatherage agreed that the latter should have one-half instead of one-third of the former's share. Deatherage retained all this increase and, as he made collections, remitted to Creason only one-half of his part as per his original employment. After the first appeal to this court Creason settled with Deatherage's estate his claim for one-half of this increase.

As stated, Cowan employed Murphy shortly after Deatherage's death. He explained to Murphy the agreement he had made with Deatherage, said that the latter's death had terminated that agreement, and agreed that Murphy should take the same proportion of fees, to-wit, one-half of Cowan's share. In April, 1921, Cowan, with Murphy present, employed Leahy and Saunders, the agreement being for "a reasonable division of the fees." In August, 1923, Spiller agreed to raise Cowan's fees from one-third of the recoveries to one-half of same, and about the same time Cowan, Murphy, and Leahy and Saunders agreed that Cowan should receive one-half of the fees and the other two firms one-fourth each. Within a few days thereafter settlement was made with the Missouri, Kansas and Texas Ry., the proceeds being distributed by Spiller who paid the attorneys as follows: Cowan, $6575.82, Harding, Murphy and Stinson, $3287.-91, and Leahy and Saunders, $3287.91. In December, 1923, Stinson retired from the firm of Harding, Murphy and Stinson and did not thereafter share in the fees. In October, 1926, the attorneys agreed to divide the fees one-third each to Cowan's firm, to Harding and Murphy, and to Leahy and Saunders. In November, 1927, the Missouri Pacific case was settled and Spiller sent Harding and Murphy a check for $350 as the share of that firm. In the same month the Frisco case was settled, the collection and distribution being made by Saunders of the firm of Leahy and Saunders. Prior to this settlement, Creason and Deatherage's executor had served the Frisco with the notice of attorneys' lien and that railroad would not settle

until this lien was released. After some negotiation, Creason and the executor released their claim to a lien upon the payment to Creason of $1582.75. Whether this was in full payment of Creason's claim in the proceeds of this settlement is now in dispute. After paying said sum to Creason, paying the expenses, and remitting Spiller's share, Saunders paid to his own firm, to Cowan's firm and to the Harding and Murphy firm each the sum of $4880.14.

At the second trial in the circuit court the pleadings were amended, new issues set up and the whole case was tried anew, resulting in a decree for the defendants from which plaintiff (Creason) appeals. Appellant contends that "the trial court erred in considering anything except the matter of accounting by Harding, Murphy and Stinson, to Creason, administrator, for one-sixth of the recoveries or collections by them after the death of Mr. Deatherage, against the receivership roads. The decision of this court on the former appeal is *res adjudicata* of all issues raised or that could have been raised at the first trial and on the first appeal." This is disputed by defendants who say: "The former opinion was not *res adjudicata*. This case was not remanded with specific instructions to enter any specific judgment. It was remanded for a new trial."

In the first trial, the court rendered judgment in favor of defendants, holding that plaintiff was not entitled to receive any portion of the fees collected by them after the death of Deatherage. The court then sustained plaintiff's motion for a new trial and from this order defendants appealed. In our former opinion, after reciting certain questions of fact as shown by the record then before us, and discussing the law applicable thereto, we said: "We hold also that the partnership estate of Deatherage & Creason, through the plaintiff administrator, is entitled to an accounting with defendants Harding, Murphy & Stinson, of the fees collected by said defendants after the death of B. F. Deatherage, as indicated above. The judgment of the trial court in sustaining the motion for new trial is affirmed and the cause is remanded with directions to the trial court to proceed in accordance with the conclusions stated above."

The language used by us did not amount to a remand with specific directions. Our direction "to proceed in accordance with the conclusions stated above" did not add anything to the remand. The meaning would have been exactly the same if we had omitted these last quoted words and our concluding sentence had read: "The judgment of the trial court in sustaining the motion for new trial is affirmed and the cause is remanded." [Denny v. Guyton, 331 Mo. 1115, l. c. 1129, 57 S. W. (2d) 415.] The trial court, in effect, held that the death of Deatherage terminated all interest of his firm in the uncollected judgments and that the plaintiff was not entitled to receive any portion of the fees collected by defendants after the death of Deatherage (see our former opinion, 325 Mo. l. c. 669, 30 S. W.

(2d) 1.). The trial court became convinced that this holding was wrong and sustained plaintiff's motion for a new trial. If no appeal had been taken the case would have stood for retrial on all the issues. In our former opinion we discussed the effect of Deatherage's contingent contract for one-sixth of the amount recovered; stated the reasons for our view that his death did not terminate the interest of his firm in judgments procured in his lifetime and collected after his death; held that plaintiff, as administrator of the partnership estate, was entitled to an accounting as to collections made on such judgments, "as indicated above;" but we did not specifically hold that plaintiff was entitled to one-sixth of such collections. We did hold on the record then before us that plaintiff's interest could not be limited to a *quantum meruit* basis because that issue was not tendered by the pleadings and the evidence.

█ Our former opinion became and, so far as the facts are the same, remained "the law of the case," but it is not as to all issues *"res adjudicata."* Judge WHITE wrote our former opinion in this case. He also wrote our opinion in the second appeal of the case of Denny v. Guyton, supra, in which he reviews the authorities and points out the difference between the terms *"res adjudicata"* and "the law of the case," saying:

" 'The law of the case' applies where a general principle of law is declared as applicable to the facts of the case. If it is remanded generally all issues are open to consideration on a new trial. The pleadings may be amended or new and controlling facts produced. Often a second appeal presents a totally different case from that appearing on the first appeal. In all cases of general reversal, whether different issues and different evidence appear in the second trial or not, this court, upon a second appeal, if convinced that it has, on the first appeal, announced a rule of law out of harmony with our former rulings or has been mistaken as to some controlling fact (not in the weight of the evidence) may overrule its pronouncement in the former appeal. . . . A statement of the law as applied to the facts in the cause is one thing and a determination of the *issues* tendered in the cause is another thing. Where a case is reversed and remanded with specific directions to try certain issues *only,* all other issues are determined on the first appeal. In general reversal and remand the court states a *rule* for further proceeding on the issues joined. Where the reversal is with specific directions as to certain issues, *other issues determined* are foreclosed to further inquiry. The first states 'the law of the case,' the second is *res adjudicata* final."

This question has been passed upon many times by this court. It is unnecessary to review the cases. They hold: If the facts on the second trial present a different case from that presented on the first, the trial court will be bound by our prior decision only so far as the principles of law then declared are applicable to the new state of

464

facts. [Crossno v. Ry., 333 Mo. 793, 62 S. W. (2d) 1092, l. c. 1094; Davidson v. Ry., 301 Mo. 79, 256 S. W. 169; Murphy v. Barron, 286 Mo. 390, 228 S. W. 492; Hogan v. Ry., 322 Mo. 1103, 19 S. W. (2d) 707; Smiley v. Kinney, 262 S. W. 349; Wilcox v. Phillips, 260 Mo. 664, 667, 169 S. W. 55; Barber v. Ins. Co., 279 Mo. 316, 214 S. W. 207.]

Denny v. Guyton, supra, like the present case, was a suit for accounting in equity. On the first trial, plaintiff obtained judgment; the trial court sustained defendant's motion for a new trial and plaintiff appealed from that order; we *reversed* the action of the court in granting a new trial and remanded the case, specifically, on one issue *only*. In the present case we *affirmed* the action of the trial court in granting a new trial and remanded the case.

In the first trial of this case defendants contended that the death of Deatherage terminated the contract of his firm. At the second trial, without objection, defendants filed their third amended answer setting up new issues and plaintiff filed reply. This answer reasserted defendants' first contention, but contained the following:

"That by virtue of the premises and in equity and good conscience plaintiff has no right, title or interest in or to any of the fees so paid to these defendants or to the fees paid to said Leahy & Saunders, but that if plaintiff has any right or interest of any kind in or to any of said fees, which these defendants deny, it could only be on a basis of *quantum meruit* with said Cowan for the reasonable value of actual services rendered prior to the failure or termination of their contract on the 21st day of January, 1921, caused by the death of said Deatherage, and these defendants state that plaintiff and said Deatherage have received fees allowed and taxed as costs in the cases against the Missouri, Kansas & Texas Railway Company, St. Louis & San Francisco Railroad Company, Missouri Pacific Railway Company and the Iron Mountain Railroad Company far in excess of the value of services rendered by them."

In the former opinion we ruled that the death of Deatherage did *not* terminate the contract of his firm so as to deprive the partnership estate of all interest in fees collected after Deatherage's death. That ruling prevented the revival of that issue on the second trial since the facts pertaining to it remained the same. But defendants' amended pleading did inject new issues in this: (1) as to *quantum meruit*; (2) as to the effect of the collection and retention by Deatherage in his lifetime of the judgments allowed to his client, Spiller, as attorney fees. These are termed by the parties "allowed fees."

We did not rule these issues in the former opinion. On the question of *quantum meruit* we said:

"If these defendants had desired that the amount to be received by plaintiff on the accounting should be limited to a *quantum meruit* basis, they failed to tender any such issue. They denied at all times

that plaintiff administrator of the firm of Deatherage & Creason was entitled to any compensation to be realized out of the judgments which they procured. Plaintiff was not obliged to sue in *quantum meruit*. He could sue on his contract as he did and recover in *quantum meruit*, if the pleadings and evidence had justified it. But that issue is not and was not in the case."

Nor was the question of the so-called "allowed fees" in issue on the first trial. Then, it seems, it was assumed that these fees were rightfully retained by Deatherage. In one of defendants' briefs filed in the former appeal it was stated:

"Cowan came to Kansas City and employed B. F. Deatherage to assist in the bringing of these suits here. His arrangement with Mr. Deatherage was oral and provided that Burney, Deatherage and Cowan would divide the attorney fees by three, Cowan and Burney getting two-thirds and Deatherage one-third, including any attorney fees allowed by the Court."

In their amended pleading at the second trial, defendants set up the receipt of these "allowed fees" by Deatherage, not as an offset, but to show that Deatherage had been overpaid. The trial court sustained this contention, holding as a fact that Deatherage was entitled to only one-sixth of these fees and by retaining one-half of them Deatherage had been overpaid. (As before stated the other half went to Cowan.)

Ordinarily we defer to the finding of the Chancellor, but in this instance we are unable to do so. Before the second trial Cowan had died, but his testimony given at the first trial was introduced and is as follows: (R. 128)

"Q. What agreement or understanding did you make at that time with Mr. Deatherage, relative to compensation? A. I told him about the agreement I had with the cattle raisers association and that the amount of fees we would get out of it, and in that particular was mentioned also the fees that the court, trial court, would allow at the trial. That we would just divide it three ways; as Burney and I divided equally in business at that time; that we would just divide it by three; he would take one-third of the net fees; that we would take two-thirds, and that was agreeable."

Afterward Deatherage's percentage was increased to one-half of Cowan's share.

Spiller did not testify at the first trial. At the second trial, over the objection of plaintiff's attorney that Cowan was dead, Spiller was permitted to testify as to these "allowed fees" and as to his arrangement with Cowan. Spiller testified, in substance, that he had received no part of these fees; that he didn't know that they had been allowed by the court until "the last few days;" that he knew that the attorneys had collected some fees but didn't know the exact nature of them until recently; that Cowan was his general

attorney and had authority to employ other attorneys. Spiller admitted that he was present when the cases were tried in the United States District Court.

Spiller gave this testimony at the second trial late in 1933. Although he said he had learned of the allowance of these fees only in "the last few days," yet seven years before that, on October 14, 1926, he with Cowan, Murphy, and Saunders had signed a written instrument which they termed a "confirmatory agreement," and which, among other things, provided:

"In confirmation of the agreements and understandings from time to time made between E. B. Spiller . . . and S. H. Cowan, and between said Spiller and . . . S. H. Cowan, D. A. Murphy and Walter H. Saunders, relative to attorneys' fees to be paid to said Cowan, Murphy and Saunders for services rendered and to be rendered. . . . said attorneys shall receive one-half of whatever sum may be collected either under the judgment of the United States Circuit Court of Appeals of the Eighth Circuit, or by compromise, or through any other means, *plus any attorneys' fees that may be adjudged by the court to be taxed as costs.* That said Spiller . . . does hereby assign to said attorneys . . . one-half of all claims, judgments and rights of recovery, or rights of action, *and all such attorneys' fees as may be allowed and taxed as costs,* if any." (Italics ours.)

Said instrument was signed by Spiller and by each of said attorneys Cowan, Murphy and Saunders and attached thereto was an additional paragraph, signed by each of said attorneys, as follows:

"For mutual considerations and the consideration of our respective interests . . . evidenced by the contract this day put in writing and executed between ourselves and E. P. Spiller; and in pursuance of the understandings and agreements *from the inception and throughout this litigation* resulting in the judgment of the United States Circuit Court of Appeals for the Eighth Circuit, or by compromise, including the contingent interest and attorneys' fees as stated in the attached contract; it is hereby agreed . . . that each of us is to receive one-third of the amount to be collected." (Italics ours.)

This instrument with the attached paragraph indicates to us that Mr. Spiller knew about these "allowed fees" and that it was the understanding of all the parties "from the inception and throughout this litigation" that the attorneys should retain *all* the sums allowed as attorney fees. Murphy, at the time he was employed by Cowan in 1921, knew that Deatherage and Cowan had theretofore divided these allowances between themselves. In fact, in 1920, while Deatherage was in Australia, Murphy collected and distributed a very considerable portion of these "allowed fees." The trial court erred in admitting the testimony of Spiller over plaintiff's objection that

Cowan, the other party to the contract, was dead. [Sec. 1723, R. S. 1929, Mo. Stat. Ann., p. 3994.] Defendants do not contend that this statute is inapplicable except to claim that the burden of proving his contract rested on the appellant.

Conceding that the burden was on the plaintiff to prove his interest in the "allowed fees," he met this requirement and made a prima facie case by Cowan's testimony. Cowan was Spiller's general attorney with authority to employ other attorneys and he employed defendants as well as Deatherage. Defendants should not have been permitted to overcome plaintiff's prima facie case by Spiller's incompetent testimony.

Defendants stress the fact that these "allowed fees" were allowances to the client and not to his attorneys. So they were and so also were the main judgments for damages, but Spiller had the same right to award to his attorneys all sums that might be allowed to him as attorney fees as he did to award to said attorneys one-half of all sums that might be allowed to him as damages. Defendants also argue that it is unlikely that Spiller would contract away all the "allowed fees." A sufficient answer to that is that Spiller did make such a contract with the defendants as shown by the "confirmatory agreement;" not only that, but in his contract with defendants he agreed to pay all the expenses, while the contract during the life of Deatherage provided that the expenses should come out of the share of the attorneys.

On the record before us, we hold that plaintiff, as administrator of the partnership estate, is entitled to share in the collections made after Deatherage's death, but he cannot recover the entire one-sixth interest provided by the contract and his recovery must be on a *quantum meruit* basis.

"A contract for legal services being personal in its nature, the death of the attorney, rendering performance impossible, terminates the contract, and his representatives cannot lawfully employ any one to perform the services which the attorney was employed to render. This is true, although the deceased attorney was a member of a firm, if it was understood that he was to give the matter his personal attention. But, where a firm is retained and one partner dies, the contract is not terminated, and the survivor cannot refuse to carry to completion executory contracts with clients which were in force at the date of dissolution. But the client has the option of discharging the survivor, settling for services previously rendered, and employing other counsel to conclude his pending litigation." [6 C. J., sec. 187, p. 675.]

"When one member of a firm dies and a client exercises his privilege of changing his attorneys, the client is liable for the reasonable value of the services already rendered. . . ." [6 C. J., sec. 325, p. 747.]

The above quotations from Corpus Juris are in harmony with the weight of authority in other jurisdictions and with our previous rulings in Callahan v. Shotwell, 60 Mo. 398, and Morton v. Forsee, 249 Mo. 409, 155 S. W. 765.

At the second trial defendants offered to prove the reasonable value of the services rendered by Deatherage and Creason up to the time of the death of Deatherage. This was excluded by the court and, in so doing, the court erred. We are reluctant to send this case back for a third trial and believe there is enough in the record to enable us to make a final determination, for we think the parties themselves have fixed a standard by which we can measure the amount that plaintiff should recover. Certainly there is abundant proof of the volume and extent of the work done by Deatherage, as well as of the services performed by the defendants, and the services of both were enormous. For these services Deatherage and Creason have received something more than $19,000 and Harding, Murphy and Stinson have received something less than $10,000 in fees.

In the settlement with the Frisco Railway the amount of the recovery was $31,654.95. One-third of that is $10,551.65. The expenses were $4855.84, which being deducted from the one-third leaves $5695.81, to one-half of which, to-wit, $2847.90, plaintiff's firm would have been entitled if it had carried the case through to the final conclusion. Plaintiff settled his claim in this settlement for the sum of $1582.75, and we see no reason why the same proportionate division should not be made in the recoveries from the other two railroads.

Plaintiff contends that he did not settle in full for his claim in the Frisco recovery, but we are compelled to hold against him on that contention. This settlement was made in November, 1927. On November 7th, Murphy wrote to the administrator of Deatherage's estate and to Creason "it is the understanding that you are to receive ten per cent of the fees paid to Cowan, Saunders and myself in the settlement . . . and the receipt thereof by you shall be without prejudice to either side in the litigation instituted by Mr. Creason . . . and now pending in the Supreme Court." Creason and the Deatherage administrator accepted this proposal in writing, stating therein that it was agreed between them that their acceptance would not prejudice the rights of either in the case pending in the Supreme Court. Creason and the Deatherage administrator then filed a petition in the probate court and procured an order permitting them to accept the proposal, both the petition and order stating that the acceptance should be without prejudice to the rights of the petitioners in the pending case, but terming it "an agreement of compromise and settlement of their respective claims for attorneys' fees in the case of Spiller v. St. Louis & San Francisco Railroad Co." Creason and the Deatherage administrator then withdrew their notice of lien and signed a receipt as follows: (R. 119)

"RECEIVED FROM Harding, Murphy & Tucker, the sum of Fifteen Hundred Eighty-two and 75/100 ($1582.75) Dollars *in full settlement* of the shares of Goodwin Creason, Administrator, and W. N. Deatherage, Executor and/or both of them of attorneys fees in the case of Spiller v. St. Louis-San Francisco Railroad Company. This receipt is in accordance with agreement between Harding, Murphy & Tucker and others and Goodwin Creason, Administrator, and W. N. Deatherage, Executor, dated November 7, 1927, and in accordance with the rights of all parties as therein preserved. And this receipt is made without prejudice to the rights of any of the parties *in any other litigation.*" (Italics ours.)

Creason contends that the reservations contained in the correspondence, petition, order and receipt prevent this transaction from being a settlement in full for his claim in the Frisco matter, but it is clear to us that these reservations only preserve Creason's claim to a portion of the recoveries from the *other* railroads and that the transaction is a full settlement of his claim in the *Frisco* matter. Otherwise, if this was merely a receipt of *part* of the money due in the Frisco settlement, it was unnecessary for Creason to procure permission from the probate court to receive the money.

Creason also claims that the settlement is not binding because "the acceptance by a creditor from a debtor of a less sum than due, even though it states it is in full, is without consideration and is not binding upon the creditor." He cites a great many decisions, typical of which is Riley v. Kershaw, 52 Mo. 224. It is unnecessary to review them. They are all cases where the debt is liquidated and there is no honest dispute as to the amount due. They all qualify the rule by recognizing that where, in good faith, the indebtedness or the amount of it, is in dispute, the payment and receipt of a less sum than claimed, or a less sum than actually due, by way of compromise, is based on a valid and binding consideration. [Zinke v. Maccabees, 275 Mo. 660, 205 S. W. 1.] We rule this point against appellant and hold that he has settled in full his claim for participation in the recovery from the St. Louis and San Francisco Railway.

In the Missouri, Kansas and Texas settlement the recovery was $28,-984.74. One-third of same is $9661.58, from which must be deducted the expenses, $1536.55, leaving $8125.03. Plaintiff's firm, if it had carried the case through to a finality, would have been entitled to one-half of the net one-third or $4062.51. Murphy's firm received from Spiller $3287.91 and Leahy and Saunders received the same amount.

In the Missouri Pacific settlement, plaintiff in his main brief, at page 153, says the amount of recovery was $1400 and there was no expense. Murphy received from Spiller $350 as his firm's share of the fees and the record does not show on what this was based. The contract fee of plaintiff's firm would have been one-sixth ($\frac{1}{2}$ of $\frac{1}{3}$), of the *net* recovery, to-wit, $233.33.

Using the same standard that the parties agreed on in the Frisco settlement, to-wit: 1582.75 ÷ 2847.90 of the contract fee, the fee of plaintiff's firm in the Missouri, Kansas and Texas recovery is $2263.33 and in the Missouri Pacific recovery is $128.20.

■ However, plaintiff's firm is not entitled to recover these entire amounts from defendants. A history of the employment of the attorneys is heretofore set out. At the time of Deatherage's death, his fee was to be one-sixth of the net recoveries; after Deatherage's death, Cowan attempted to award this *same* interest to Murphy. Later Murphy abandoned this agreement and, before any collections were made, Cowan employed the firm of Leahy and Saunders and the interest of plaintiff's firm was awarded in equal proportions to Leahy and Saunders and to Harding, Murphy and Stinson. We do not think that Harding, Murphy and Stinson are liable to plaintiff's firm for the proportion of its fees received by Leahy and Saunders.

The rule is stated in 1 Corpus Juris, page 646, section 137, as follows:

"3. DECREE AGAINST DEFENDANTS JOINTLY. In an equitable action for an accounting, where the property sought to be recovered is held separately by two defendants, a judgment against the two defendants jointly for the total amount retained by them is erroneous, but the court should ascertain the separate liability of each defendant and award judgment as to each accordingly."

In Eisentraut v. Cornelius, 134 Wis. 532, 115 N. W. 142, plaintiff sued as administratrix for an accounting to recover from defendants, money, notes, securities and property which it was alleged they wrongfully obtained from decedent. It was alleged the defendants had used undue influence on administratrix' deceased to secure a conveyance of certain property. The lower court rendered judgment against the defendants for the amount jointly. On appeal, the Supreme Court held as follows, l. c. 145:

"The circuit court awarded judgment that plaintiff recover from defendants jointly an amount equal to the total amount of the property that both defendants were found to have obtained from the decedents. This was erroneous. The proof discloses that the property for which recovery is sought was held separately by the two defendants. Under such circumstances, in an equitable action for an accounting, the court must ascertain the separate liability of each defendant and award judgment as to each accordingly."

■ Plaintiff did not see fit to make the firm of Leahy and Saunders parties to this action and defendants did not object on the ground of defect of parties. This does not permit the plaintiff to recover the entire amount from the named defendants.

In Hunter v. Hunter, 50 Mo. 445, defendants, occupying a fiduciary relationship toward the plaintiff, defrauded him. Plaintiff sued

one of them for an accounting, charging the fiduciary relationship and fraud. The evidence showed that the other fiduciary received all of the profits. We said, page 452:

". . . The only remaining question is what decree ought to be rendered against the defendant Hunter? He has never in fact received any part of the gains made by the resale. Trustees are only bound for what they realize. They are not jointly bound unless the funds were received by them both. Each must account, in a case like this, for what comes into his hands."

In our former opinion, 325 Mo. 1. c. 674, 30 S. W. (2d) 6, we said: "Harding, Murphy & Stinson employed to assist them in making collections from the different railroads, the firm of Leahy & Saunders of St. Louis." Again at page 677 we said: "Murphy's firm paid a fee to the firm of Leahy, Saunders & Walther for services rendered by the latter as stated." On the present record, neither of said statements is accurate. The proof shows that Murphy suggested the employment of Leahy and Saunders and participated with Cowan in talking to them about employment, but that the employment was agreed upon by Cowan and Leahy and later confirmed by Spiller. Nor is there anything in the present record tending to show that Murphy's firm paid any part of the fee to Leahy and Saunders. The amount recovered from each railroad, Missouri, Kansas and Texas and Missouri Pacific, was paid direct to Spiller and he sent to each firm of attorneys the amount of fees apportioned to it.

Under these facts, we hold that defendants, Harding, Murphy and Stinson, are liable for one-half only of the fees due plaintiff's firm, that being the proportionate part of such fees received by them. But defendant, Stinson, had retired from the firm before settlement was made with the Missouri Pacific Railway and is not liable for any part of that fee.

The proof shows that Stinson, while a member of the firm of Harding, Murphy and Stinson, received 24 per cent and Harding and Murphy received 38 per cent of the firm's earnings. Stinson argues that the liability, if any, should be fixed in the same proportion and judgment rendered separately.

As between the partners themselves that would be true, but as between Creason and the partnership each partner is liable for the whole amount due from the firm. That is the general rule (Priddy v. MacKenzie, 205 Mo. 181, 103 S. W. 968; Midland National Bank v. Schoen, 123 Mo. 650, 27 S. W. 547), and Stinson has cited no cases which alter the rule. The cases cited by him are either accountings among partners, like State v. Case, 59 Iowa, 491, or cases in which one partner received no part of the fund like Spear v. Newell, 2 Paine (U. S.) 267, which holds that such dormant partner is not liable. That case is in line with our holding that Stinson is not liable in the Missouri Pacific settlement because he received nothing, but does not

472

limit his liability in the Missouri, Kansas and Texas settlement where he was a partner and shared in the fund.

■ Plaintiff contends for interest on all sums awarded from the date of receipt by defendants. The allowance of interest in a case like this is discretionary. [33 C. J., sec. 14, p. 182.] The numerous briefs filed herein contain statements which indicate bad feeling between the parties, but we find nothing in the record to impugn the motives of either side. Defendants erroneously believed that the death of Deatherage terminated the entire interest of his firm; plaintiff erroneously believed that he could recover the entire contract interest. The correct amounts due from defendants were undetermined until the effective date of this opinion and interest should be awarded from that date only. [Equitable Trust Co. v. Central Trust Co. (Tenn.), 239 S. W. 171; Johnston v. Ry. (Tenn.), 240 S. W. 429; Shipman v. State, 44 Wis. 458, l. c. 452; Sweeney v. Neely, 53 Mich. 421.]

It follows, therefore, that the judgment should be and is reversed and this cause remanded with directions to the trial court to enter judgment in favor of plaintiff, as administrator of Deatherage and Creason, against John T. Harding, David A. Murphy and Paul R. Stinson for the sum of $1131.66, and against John T. Harding and David A. Murphy for the sum of $64.10, said judgments to bear interest at the rate of six per cent per annum from date of entry.

All concur, except *Gantt, J.,* not sitting.