FRANCIS M. BARNES, JR., v. THE BOATMEN'S NATIONAL BANK OF ST. LOUIS, a Corporation, Executor of the Estate of HUGH W. THOMASSON, Appellant.—156 S. W. (2d) 597.

Division Two, October 25, 1941.

Rehearing Denied, December 16, 1941.

*Franklin E. Reagan, James V. Frank* and *Charles Chaflin Allen, Jr.,* for appellant.

1034

*Fordyce, White, Mayne, Williams & Hartman, Barker, Durham & Drury, Clifford Greve, Jr.,* and *James T. Blair, Jr.* for respondent.

TIPTON, P. J.—This case comes to the writer on reassignment. Respondent filed a petition in two counts in the Circuit Court in the City of St. Louis, Missouri, against the appellant for services rendered as a psychiatrist in a suit involving the estate of Hugh W. Thomasson, deceased. Count one was upon a contract entered into on or about February 15, 1933, between the respondent and the two administratrices of Hugh Thomasson's estate, Ella Bolles and Elmira Townsend. Count two was on a *quantum meruit* for the value of the services rendered under that contract. Count one was dismissed during the trial; respondent obtained a judgment on count two in the sum of $15,000. It is from that judgment appellant has duly appealed.

Hugh W. Thomasson was married to a woman, referred to in the record as Grace Thomasson, on July 25, 1930, and on February 23, 1930, in the State of Illinois, and subsequently was married to her again on January 12, 1933, in the State of Arkansas, which was about two weeks prior to his death on January 28, 1933, in that state. The evidence shows that Grace Thomasson was an adventuress, and that she and her associates kept Hugh Thomasson in captivity from the date of her first marriage until his death. During this time he put mortgages on his property and signed warranty deeds conveying other portions thereof to her or one of her associates, followed by various conveyances to trustees and others calculated to put the property beyond his reach and the reach of his heirs or devisees.

During his lifetime numerous suits had been filed against him and in his name by various persons in an attempt to arrest the schemes of Grace Thomasson and her associates in their design to possess themselves of Hugh Thomasson's estate or to perpetuate the titles of

the persons who had obtained this property from him, all of which suits were pending at his death. In fact, one was being tried at that time, and ninety days had already been consumed in its trial. This is referred to in the evidence as the "ninety-day" trial. The respondent, Francis M. Barnes, Jr., had been used as a witness in the trial of that case; he also had advised the attorneys trying the case for the next of kin of Hugh Thomasson. The issue in that case, as well as in all subsequent cases herein referred to, was the sanity of Thomasson.

On February 13, 1933, Ella F. Bolles and Elmira Townsend were appointed administratrices of Hugh Thomasson's estate by the probate court of the city of St. Louis, Missouri. About the same time, letters of administration were issued in St. Louis County to the public administrator, and also Grace Thomasson, his ostensible widow, caused letters of administration to be issued in Little Rock, Arkansas.

The administratrices, Bolles and Townsend, were represented by Mr. Taylor Young and Mr. Patrick Cullen, of the St. Louis City bar. Shortly after their appointment as administratrices, they undertook to recapture the property of the estate. On January 6, 1933, Hugh Thomasson had been adjudicated a person of sound mind in a court in Little Rock, Arkansas. These administratrices instituted proceedings to set aside this adjudication, and also to cancel the letters of administration that had been issued to Grace Thomasson in Arkansas. The public administrator in St. Louis County brought an⁰ action to enjoin these administratrices from interfering with his administration of the estate, but the administratrices secured a preliminary writ or prohibition from this court. An issue of fact was raised in that proceeding, and this court appointed Honorable Grover Huston, of the Lincoln County bar to take the evidence. This writ was later made absolute. Numerous other suits were filed or pending which will not be necessary to detail, but suffice to repeat the issue in all cases was the sanity of Hugh Thomasson. At the time of his death, all of his assets had been either conveyed away or were so encumbered that the estate was without any tangible assets.

Taylor Young and Patrick H. Cullen were of the opinion that the services of a psychiatrist were necessary and, with the consent of the administratrices, employed the respondent for the litigations then pending or that would thereafter be pending, in regard to capturing the assets of the estate, upon contingency that they would be successful in the various litigations, and in that event his fee would be $25,000.

The respondent testified that he had never seen Hugh Thomasson; that his opinion as to his sanity was based upon information received from reading deposition, testimony, and affidavits, from hearing witnesses, and from conferences with witnesses and counsel. He further testified that a substantial portion of his time was taken up from sometime in February, 1933, to October 24, 1933, in studying the

testimony and statements of witnesses and in advice to counsel, in appearing in court as a witness, in an advisory capacity with reference to other witnesses, and in conferring with counsel during the various trials, in their offices and on the telephone, and maintained "the services about which I have been testifying are the services contemplated under this agreement."

A short time prior to October 24, 1933, a will was found executed by Thomasson naming the appellant as executor of his estate. That will was duly probated in the probate court in the city of St. Louis on that date and the administratrices, Bolles and Townsend, were discharged. Other pertinent facts will be stated during the course of this opinion.

The only point raised and developed by appellant in its brief is that its demurrer to the evidence should have been sustained; first, because the contract sued on is against public policy and therefore unenforceable, and second, because the action is barred by the five year statute of limitations.

■ The fact that a contract is against public policy is an affirmative defense and should be pleaded, but if it appears from the plaintiff's own showing that the contract is against public policy, the court will refuse its assistance. [McDearmott v. Sedgwick, 140 Mo. 172, 39 S. W. 776; Shohoney v. Railroad, 231 Mo. 131, 132 S. W. 1059; Smith v. Brougher, 274 S. W. 532.] The appellant did not plead in its answer that the contract sued on is against public policy, but it does contend that this showing is made by respondent's case and therefore the question is properly before the court.

■ On February 15, 1933, Taylor Young wrote the respondent the following letter:

"Feb. 15th, 1933.

"Dr. Francis M. Barnes,
University Club Bldg.,
St. Louis, Mo.

"Dear Dr.—Confirming my statement to you the other day this is to advise that I have consulted with the administratrices of the Estate of Mr. Thomasson and it is agreeable that your fees for expert testimony in all future litigation in the estate, for and against, be fixed on a contingent basis of $25,000.00, with the understanding that they are not to be personally liable in the event the Probate Court should not allow them credit, but they feel sure the heirs will approve in any event. It is of course understood that if the notorious Grace should win everything your services, as well as ours, would be chargeable to a good cause lost through the chicanery of others.

"Yours, very truly,
"Taylor Young."

Appellant contends that this is the contract on which the respondent's cause of action is based; while on the other hand respondent

asserts that the contract was oral and this letter "was not intended to set out all the terms of the contract, but was written chiefly to exonerate the administratrices."

For the purpose of this case, we will assume the letter constituted the contract. The question arises as to what the respondent was required to do under this contract. First, what is meant by the phrase "for expert testimony?" If this means that he, as an expert, is called to give testimony on a subject with which he is already conversant, then it is against public policy to pay anything other than the regular witness fee. That is to say, he "may be compelled to state his opinion upon hypothetical or other questions involving his professional knowledge, without compensation other than the witness fee tax to ordinary witness. .. . He cannot be required to especially fit himself for lines of inquiry. He should not be expected to make examinations, perform professional services and the like. For that is not the office of a witness . . .

"An expert cannot be compelled to examine a case in order to give a professional opinion, nor to make a post-mortem examination or analyze the contents of a stomach, nor to attend at a trial to hear and consider the testimony given, so as to qualify himself to give a deliberate opinion on the question of science arising upon such testimony. . . .

"In our opinion a contract would be valid to pay an expert witness for any service which the law does not compel him to do as a witness free of charge, as already pointed out. For all such services he is entitled to claim compensation; but an agreement to pay such expert . . . for being a witness as to those matters which we have held the law and his duty as a citizen require him to testify to, would be invalid." [Burnett v. Freeman, 125 Mo. App. 683, 103 S. W. 121. See also, same case reported at 134 Mo. App. 709, 115 S. W. 488, and Shelton v. McHaney, 343 Mo. 119, 119 S. W. (2d) 951.]

Thus we see that phrase "for expert testimony" is susceptible of two different meanings; one, that the respondent was to testify to matters already within his knowledge for which a contract to pay him more than the ordinary witness' fee would be invalid, and the other, for him to make an examination or study of the facts and then testify, for which it would be valid to pay him for his work. Moreover, the phrase "your services," as used in the letter, could mean his services only as a witness, or it could mean work that he was to perform exclusive of testifying.

Under these circumstances the written contract is open to construction. We could give the contract one meaning, while the parties might give it a different meaning. "In a case of that kind, whose interpretation should prevail? If the court gives one differing from that understood by the parties, it in effect makes a new agreement—the very thing most to be avoided. If it leaves the parties to

be governed by their understanding of their own language, it in effect enforces the contract as actually made. That they should be so permitted to construe their own agreement, accords with every principle of reason and justice." [The St. Louis Gaslight Co. v. The City of St. Louis, 46 Mo. 121, l. c. 128. See also, Mo. Service Co. v. City of Stanberry, 341 Mo. 500, 108 S. W. (2d) 25.] We will, therefore adopt the interpretation placed upon the contract by the parties themselves as shown by their acts and conduct. [Coleman v. Ford Motor Co., 195 Mo. App. 554, 193 S. W. 866.]

At the request of the attorneys for the administratrices, the respondent read nearly eight thousand pages of deposition (this being the deposition of over two hundred and fifty different witnesses), and affidavits, so that he could base an opinion on the question of Hugh Thomasson's sanity, as he had never seen him. He advised with the attorneys so that they could properly cross-examine other expert witnesses, and was in daily conference with these attorneys. He appeared in court as a witness and also in an advisory capacity.

So, as the parties interpreted the contract, he was to do more than be a mere witness at trials. His duty under the contract was to consult with counsel and advise them how to cross-examine other expert witnesses. From the depositions, affidavits and statements, he correlated the testimony for the attorneys for the estate, and they were at liberty to confer with him at any time they saw fit.

"An agreement by which one merely employs another to render services in looking up evidence to be used at a trial is valid, and it is immaterial whether the person employed is an attorney at law, a professional detective or a mere layman. If, however, the agreement is not merely to gather the evidence, but goes further and requires the contracting party to furnish evidence to prove a specified fact or to win the suit the agreement will be held to be invalid." [12 Am. Jur. 690, sec. 188.]

The facts in the case at bar are very similar to the facts in the case of Lincoln Mountain Gold Mining Co. v. Williams, 37 Colo. 193, 85 Pac. 844. In that case a suit was pending in St. Louis against the officers and agents of the mining company for sending through the mails fraudulent statements as to the value of its properties in Colorado. The Supreme Court of that state held that it was not against public policy for the company to employ, at an agreed price, residents of Colorado to examine the properties, have assays made, and prepare themselves to testify as to what in truth was their value, and to go to St. Louis and testify as to such value. That court further held that there was nothing to the objection that such an agreement tended to prevent or obstruct justice. In the absence of evidence suggesting that the witnesses were employed to pervert the truth or to obstruct the cause of justice the contract would be valid.

██ We therefore rule that the contract was valid, unless it became invalid because of the fact that respondent was to be paid only on the contingency that the estate was to be finally recovered.

In the case of Bell County Board of Education v. Lee, 39 S. W. (2d) 492, l. c. 493, 239 Ky. 317, the Court of Appeals of Kentucky said:

"A contract by which one employs another to render services in looking up evidence that would establish a claim or which is to be used on a trial is recognized as valid, unless its tendency is to prevent or impede the due course of justice. The mere fact that the recovery of compensation is to be contingent upon the success of the suit is not sufficient to nullify the contract. [Jones v. Henderson, 189 Ky. 412, 225 S. W. 34, 20 A. L. R. 1471; 6 R. C. L. 757; 16 A. L. R. 1437, 1440.]"

In the case of Haley v. Hollenbeck, 53 Mont. 494, 495, 165 Pac. 459, the Supreme Court of Montana held that a litigant may employ a layman to search for legitimate evidence and bona fide witnesses for compensation contingent upon the success of the litigation.

Again, in the case of Gross v. Campbell et al., 160 N. E. 511, the Supreme Court of Ohio held that the employment of one person by another to search for bona fide evidence to be used in litigation, compensation to be dependent upon the success of that litigation, is not against public policy.

The learned author of 12 Amer. Jur. 691, section 188, says:

"There are dicta in several cases indicating that the courts thought that if the contract was to procure the evidence for a contingent fee, it would not be upheld. But the decisions, so far as they have passed on the question, do not hold that the mere fact that the recovery is to be contingent upon the success of the suit is sufficient to nullify the contract. . . ."

The cases relied upon by the appellant do not hold that the mere fact that evidence procured on the contingency of the success of the litigation made a contract invalid which was otherwise valid. But the contracts involved in those cases were held invalid regardless of the contingent feature of the contract. [See Trist v. Child, 21 Wall. 441, 22 L. Ed. 623; Neece v. Joseph, 129 S. W. (Ark.) 797, 30 L. R. A. (N. S.) 278.]

Of course, counsel representing the administratrices knew that they must produce evidence to combat the presumption of Hugh Thomasson's sanity; however, there is nothing in the letter requiring respondent to furnish evidence to prove any specified fact. Nor is there anything in the evidence tending to show that respondent's testimony and advice was not his honest opinion. As this point is being ruled on appellant's demurrer to the evidence, we are not at liberty to draw the inference that respondent's testimony was false because his fee was contingent upon the success of the litigation. If we did so, we would be compelled to infer that a party litigant's testimony was

false because he is interested in the outcome of his litigation. We would also have to infer that all witnesses were guilty of perjury who were produced by an attorney trying a case on a contingent fee basis.

We therefore hold that a valid contract does not become invalid as against public policy because the respondent was to be paid for his services only on the contingency that the estate of Hugh Thomasson should be successful in its various litigations then pending.

■ The appellant next contends that this action is barred by the five year statute of limitations. Under its points and authorities it says: "There was no open, mutual and current account so as to tack all services together as required by Section 867, R. S. Mo. 1929." [Section 1019, R. S. Mo. 1939.]

This is not an action on an open account, but an action on a contract. In fact the appellant has insisted it is an action based on a written contract. Under the terms of the contract the respondent was not to be paid until he had completed all the work contemplated by it, and that could only happen when all future litigation of the estate had been disposed of. ■ Under the evidence, the respondent worked under this contract as late as October 24, 1933, when his services apparently were no longer required. Therefore, his cause of action did not accrue until that date. The fact that the respondent elected to submit his case on *quantum meruit* did not have the effect of changing a single employment into a number of employments; the transaction remained as before—a demand for a series of services performed under a single employment. The cause of action accrued only when respondent became entitled to demand payment for all the services. [37 C. J. 823, section 178; Blackwell v. De Arment's Estate (Mo. App.), 300 S. W. 1035; Balsano v. Madden, 138 S. W. (2d) 660.] The reasonable inference from the evidence is that his services were not required after October 24, 1933. The petition in this case was filed on October 19, 1938. Therefore, this cause of action was not barred by Section 1014, R. S. Mo. 1939.

It follows from what we have said that the judgment of the trial court should be affirmed. It is so ordered. All concur.