**Sherman LANDAU, Individually and as Surviving Partner of Miller & Landau, Appellant,**

v.

**Leo F. LAUGHREN and Grace Miller, Respondents.**

No. 48665.

Supreme Court of Missouri,

Division No. 2.

April 9, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied May 14, 1962.

Sherman Landau, St. Louis, for appellant.

Leo F. Laughren, St. Louis, for respondents.

**STORCKMAN, Judge.**

This action for an accounting was brought by the plaintiff, Sherman Landau, individually and as surviving partner of Miller & Landau, a partnership for the practice of law, against the defendant, Leo F. Laughren, individually and as attorney for the other defendant, Grace Miller, who is a sister of the defendant Laughren and the widow of Louis E. Miller, the deceased partner.

The petition alleged and the separate and joint answer of the defendants admitted that numerous, complicated mutual accounts were involved, and the Honorable Raymond E. LaDriere, a retired circuit judge duly qualified as a commissioner and referee under §§ 476.450 and 476.500, RSMo 1959, V.A.M.S., was appointed as referee by the Circuit Court of St. Louis County and was assigned to serve as such by an order of the Supreme Court. The referee heard the evidence, took the accounts, made findings of fact and conclusions of law, and filed his report. The plaintiff, alone, filed exceptions to the re-

port of the referee. His exceptions were heard and overruled and judgment was rendered in accordance with the findings of the referee. The plaintiff filed a motion for a new trial which was overruled and he has appealed. The prayer of plaintiff's petition is for a judgment of $16,289.73 and interest. His motion for new trial asserts that his aggregate recovery of $2,211.87 is inadequate in that he is entitled to a judgment for $21,007.94 including interest.

In the summer of 1945 the plaintiff and Louis E. Miller formed a partnership for the practice of law under the firm name of Miller & Landau. There was no written contract between them, but they shared equally in the net proceeds derived from their practice. The partners engaged in the civil practice of law, but the major portion of their law business was the representation of claimants for damages on account of personal injuries and property damage. Mr. Miller's services consisted primarily of the trial of jury cases, while the plaintiff handled the office work, interviewed clients, took statements and depositions, prepared and filed pleadings, attended to pretrial and aftertrial motions, tried nonjury cases, prepared briefs in the trial court, and briefed and argued the firm's cases on appeal.

The partnership of Miller & Landau continued until it was dissolved at the instance of Mr. Miller as of June 1, 1952. Thereafter, until the death of Mr. Miller, four months later on November 1, 1952, the plaintiff and Mr. Miller continued to occupy the same offices, to maintain a firm bank account, and employ the same secretarial help, and to pay office expenses from the partnership bank account. After June 1, 1952, the plaintiff and Mr. Miller continued to work together in processing the cases which had come to the firm prior to June 1, 1952, but legal matters referred to them after June 1, 1952, were handled by the one to whom the matter was referred unless there was a specific agreement for association in a particular case.

The evidence showed that there were approximately forty-one pending actions or claims for damages which had not been disposed of at the time of Mr. Miller's death on November 1, 1952. The essential issues in this accounting suit involve the proper division of the attorney fees received in these cases and whether the plaintiff is entitled to be reimbursed for one-half of the amount expended by the partnership for the maintenance of the office library which had its origin in law books owned by Mr. Miller individually.

The defendant Laughren represented his sister as her attorney at all times after the death of her husband. He also tried some of the partnership jury cases and disposed of others by settlement. But the necessity of dealing separately with the interests of the defendant Grace Miller, as widow or as executrix of the estate of Louis E. Miller, deceased, and of the defendant Laughren, was obviated by an agreement by the parties to the suit that the defendants may be considered as one entity, and any orders or judgments for or against them be entered accordingly. After the death of Mr. Miller, practically all contacts, negotiations and arrangements with the plaintiff were made by the defendant Laughren. Consequently, the defendant Laughren will be intended when the singular defendant is used in the course of this opinion.

The evidence is convincing that within a few days after the death of Mr. Miller, the plaintiff and the defendant Laughren made an agreement of some sort for the participation of each of them in the disposition of the partnership business not concluded at the time of Mr. Miller's death. The precise nature of this agreement and its application to each of the cases is the principal issue in this accounting suit. The respective position of the parties and the salient evidence on this issue is well-stated by the referee in his report as follows:

"Landau, the plaintiff, contends that there was no agreement that Laughren would

handle all the cases and that the fees would be divided equally between plaintiff, on the one hand, and Laughren and Grace Miller on the other, as if the latter two (defendants herein) were taking the place of Mr. Miller, the deceased. (P. 389)

"Plaintiff further states that on the contrary he proposed that Laughren handle only the trial of the jury cases on a 50–50 basis but that Laughren did not agree to that, (see page 36 for Landau inconsistent statement), and hence there was no binding contract in existence. (See letter Landau to Laughren Dec. 30, 1953, Tr. p. 556, and Feb. 13, 1954, Pl. Ex. 5; also Laughren to Landau Mar. 2, 1954, Pl. Ex. 6. See also Page 48).

"In answer to Mr. Laughren's question during trial, Mr. Landau testified that 'When you took a case that was completely prepared and negotiated a settlement in the case you performed a service for which you were not engaged and, for that reason, are not entitled to compensation, and it is a service which I could have performed myself.' (P. 215).

"He admits, however, that Mrs. Miller would be entitled to one-half of any fees arising because of work done on a given case before Miller's death and adds that he should receive not only the other half but is also entitled to be paid on quantum meruit for the percentage of the work done by him after his partner's death, (See Exhibit 27).

"Mr. Laughren testified (P. 382) that Landau stated he would like him (Laughren) to handle the Miller and Landau 'cases with him jointly and on an equal fee division basis, that he would much prefer me handling the cases than to turn them over to some other lawyer with trial experience; that he would have to pay such a lawyer fifty percent of the fee for trying the cases; that he would do all the preliminary work, and after-trial work; that I would handle the cases after they came on the docket. * * * I asked him

what he meant by a division of the fees and he said that he would divide the fee with me, or the estate, on a fifty-fifty basis, * * * of course I would have to make arrangements with the Miller estate to pay for the work Mr. Miller had done in the cases prior to his death and any interest that the estate had in the cases at that time * * *'. (Page 383). The next day (P. 389) Mr. Landau said 'that in the main Mr. Miller's work was to handle the cases after they came on the trial docket. I asked Mr. Landau if from our conversation the previous evening and the statement he had just made, that if I did accept his proposition, if that is what he would expect me to do, and Mr. Landau stated that was correct. I then said to Mr. Landau, or in effect, that in effect for all practical purposes I would take Mr. Miller's place, or the place Mr. Miller occupied in the partnership prior to its dissolution, in handling the cases after they came on the trial docket, and Mr. Landau stated that was exactly what he meant.' (P. 389). .

"I told Mr. Landau 'that I wanted it definitely understood then that the only cases I would handle were those in which suits were filed in the name of Miller and Landau, and the cases that had come to the partnership before June 1st, 1952, on which suits had not been filed, that is the Bloemker, Looser and Lorenzen cases, and I would carry out Lou's commitment to him and would handle the Kostman and Bedenk cases on an equal division basis.' (P. 393–4–5–, also P. 656)."

The correspondence between the plaintiff and defendant referred to above is enlightening and at the expense of brevity will be set out at least in part. Defendants' Exhibit LL, a letter dated December 30, 1953, and signed by the plaintiff, is directed to the defendant Laughren and reads as follows:

"I am still of the opinion that it would be to the best interests of the Louis E. Miller estate if you would continue to handle the jury trials of the Miller & Landau

cases on behalf of the Louis E. Miller estate. I will continue to handle all briefing, pleadings, appeals, and the trials of all non-jury cases. Under that arrangement, the ultimate fee would go to the Miller & Landau partnership, so that one-half of the benefits would be retained by the Louis E. Miller estate, and the other one-half by myself. Unless we can agree upon this arrangement, or upon some other arrangement which would enable us to equitably divide the work of handling the cases, it appears to me that we will be faced with the alternative of directing the clients to secure other counsel.

"The situation is further complicated by the fact that we have retained these cases for the last thirteen months upon the representation that we would handle these cases through to completion for the clients, and they may have some just complaint about being directed at this late hour to cast about for other counsel.

    *      *      *      *      *      *

"I sincerely solicit your cooperation to the extent of handling the jury trial of these cases, but if you should conclude not to do so, please let me know at once so that the clients may, in turn, be advised of the situation."

Plaintiff's Exhibit 5 is a copy of plaintiff's letter to defendant Laughren dated February 13, 1954, the first three paragraphs of which are as follows:

"This letter will evidence our understanding of last month, to my best recollection.

"As to all cases which came to the Miller & Landau partnership on or before June 1, 1952, and subject to the approval of the client, and the forwarding attorney where there is one:

"I will continue to handle all briefing, pleadings, appeals, and the trial of the non-jury cases. You will continue to handle the trials of jury cases. Upon a file being completed for trial, Miller & Landau will withdraw from the case and you will enter your appearance as sole counsel for the client. In those cases where the matter has been sent to us by forwarding counsel, you will enter your appearance as associate counsel with the forwarding attorney. The net fees resulting from the handling of these cases are to be divided equally between you and me." The letter then offers to close out the firm bank account of Miller & Landau and to open a new account "in the individual names of both of us". The letter concludes by stating that the plaintiff is "continuing to solicit the approval of clients and forwarding attorneys to this arrangement" and that he has "up to the present time secured express approval" in twenty-two cases which are listed in the letter.

On March 2, 1954, the defendant Laughren wrote the plaintiff as follows:

"This will acknowledge your letter of February 13, 1954, setting out to the best of your recollection our understanding of the matter we agreed upon sometime during January, 1954.

"The statements I made to you in January, 1954, were a reiteration of the agreement we had reached in November, 1952, at the time of our first discussion of these matters after Mr. Miller's death. At that time it was agreed that the partnership of Miller & Landau had been dissolved on June 1, 1952 and that you and I were to conclude this business with the approval of the clients on an equal fee division basis. You repeatedly told me that you had contacted all the clients or forwarding attorneys and they had agreed to this arrangement, that is, that you and I were to conclude the cases with the exception of two cases referred by your brother-in-law and one case referred by an East St. Louis lawyer who later employed you alone to handle the case.

"I don't suppose it is necessary to call to your attention the fact that the case of Mayor v. St. Louis Public Service Company was my case and I turned it over to Mr. Miller to handle for me under an agreement whereby I would receive one-

half of the fee. The remainder fee, of course, will be divided agreeable to our understanding with respect to the division of fees.

"When you are in position to write me including the remainder of the cases, and deliver the files to me, I will proceed with the matter of disposing of the cases as we agreed upon verbally in November, 1952 and again in January, 1954:"

The referee found that in November 1952 after the death of Mr. Miller the plaintiff and the defendant Laughren had orally agreed that all cases which had come to the partnership of Miller & Landau before June 1, 1952, would be considered as firm business and that all cases which came in thereafter would be the individual business of the one to whom the client came. As to the handling of the cases and the division of fees, the referee concluded: "D. That Plaintiff and defendant Laughren also agreed that said Laughren would handle all the firm's jury cases after same were prepared for trial by plaintiff, and that the fees would be divided equally between the plaintiff on the one hand and the defendants Laughren and Grace Miller, the widow of Louis E. Miller, on the other, and that said defendants were taking the place of the deceased, Louis E. Miller; said agreement included all the cases which were pending and the Bloemker, Looser and Lorenzen cases which had not yet been filed."

When the letters of December 30, 1953, February 13, 1954, and March 2, 1954, were written, the first nineteen (perhaps twenty) of the forty-one cases listed on plaintiff's Exhibit 27 had been concluded as appears from the dates set opposite the names of the cases and the fees had been distributed in a manner consistent with the defendant's version of the agreement and the referee's finding as set out above. The letters indicate a purpose to *continue* to handle the cases on the same basis and, according to Exhibit 27, this was done in all of the cases as they were disposed of and fees received except the last three. In these,

Spagnola, Walz and Semanek, the cases were disposed of but the fees were not paid over by the Alton attorneys before this litigation started.

It is unnecessary to discuss each case separately and in detail. In summary it may be said that as to eleven of the forty-one cases on his Exhibit 27, the plaintiff concedes that the fees were properly divided equally between him and the defendants and, as to those cases, he makes no claim for an adjustment or refund. As to the three cases of Spagnola, Walz and Semanek against the Illinois Terminal, in which the fees aggregating $4,958.33 were paid into court by the Alton attorneys, the plaintiff claims the entire amount. As to the remaining cases, the plaintiff claims that the defendants were overpaid in that they were not entitled to share equally with him and that he is entitled to be reimbursed in the amount shown opposite the style of each case in the "deficit" column of his Exhibit 27. The plaintiff also claims $637.-32, being one-half of the amount expended by the firm in the maintenance of the library. In most cases the plaintiff distributed the fees personally. In the Mayor case the defendant Laughren was also allowed one-half of the fees as the forwarding attorney. In the Bloemker case the plaintiff deposited the fee of $3,083.33 in his personal account and then gave the defendants a check for one-half of the fee out of the firm's account which resulted in the plaintiff receiving $2,312.50 and the defendants $770.83.

In accordance with the report and recommendations of the referee, the court found that the plaintiff and the defendants were each entitled to one-half of the sum of $4,958.33 deposited in court, one-half of the proceeds of a $500 U. S. Treasury Bond with coupons attached belonging to the firm which had also been deposited in court, and one-half of the partnership bank account; but that defendants were entitled to receive $770.83 from the plaintiff as their full share of the fee in the Bloemker case, and that $253.53, being one-half of the

bank account, also be deducted from plaintiff's share of the funds on deposit and be paid to the defendants, after which the plaintiff would be entitled to withdraw and retain the entire amount in the firm's bank account. Further, the court ordered that the plaintiff's claim for one-half of the proceeds of the sale of the library, books and equipment and for a refund from defendants for alleged overpayments be denied, and that the plaintiff pay the costs other than reporter fees which had been paid equally by the parties.

█ We agree with the conclusion of the referee and court that there was an agreement between the plaintiff and the defendant Laughren for winding up the partnership which was in substance that the defendant would do the trial work necessary to dispose of the remainder of the partnership business and in effect perform the services and take the place of Mr. Miller in the liquidation of the partnership in consideration of the defendants on behalf of themselves and the Miller estate receiving the same share of the fees that Mr. Miller would have received if he had lived. The twenty-three-page report of the referee bespeaks meticulous care in receiving and analyzing the testimony supporting the conclusions he reached. There is no need to expand on it here. We have carefully examined the transcript of more than 700 pages and approximately 65 exhibits. The record is unnecessarily long by reason of circumlocution on the part of witnesses who should know how to answer or state a thing directly. Our examination of the record and exhibits, however, convinces us that the report of the referee and his conclusions which were accepted by the trial court have overwhelming support in the evidence.

█ If there were any doubt or ambiguity with regard to the agreement and its terms, the conduct of the parties in handling the cases and dividing the fees during the seven years following the death of Mr. Miller would be quite conclusive. It is well established that in construing an ambiguous or disputed contract the interpretation the parties placed on it by their conduct is of great weight in determining what the agreement actually was. Lee v. Missouri State Life Insurance Co., 303 Mo. 492, 261 S.W. 83, 86 [3]; Clayton v. Wells, 324 Mo. 1176, 26 S.W.2d 969, 973 [4]; State ex inf. McKittrick ex rel. City of Springfield v. Springfield City Water Co., 345 Mo. 6, 131 S.W.2d 525, 532 [7]; Barnes v. Boatmen's National Bank of St. Louis, 348 Mo. 1032, 156 S.W.2d 597, 601 [5]; Mathews v. Danahy, 26 Mo.App. 660; Zeppenfeld v. Morgan, Mo.App., 168 S.W.2d 971, 976 [13]. Where a party by his performance construes the contract in a manner that is against his interest, his actions are generally considered conclusive against him. Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 852 [16].

The conduct of the parties was consistent with the agreement as testified to by the defendant and found by the referee and the court. Some of the settlements of the cases, although satisfactory to the client and the defendant, were over the protest of the plaintiff. Nevertheless, after each of the cases were disposed of, except for the three fees that were paid into court, the plaintiff either distributed the net fees between him and the defendants in accordance with the arrangement testified to by defendant Laughren, or else the division made by others was with the consent of the plaintiff. In excusing his conduct, the plaintiff says that the defendant was demanding and threatening. The testimony of the plaintiff falls short of showing any coercion. It is inconceivable that demands or threats could produce in the plaintiff a uniform course of action over a period of years if it were not in accordance with the agreement of the parties.

Except the first four cases on Exhibit 27 in which the work was substantially complete before Mr. Miller's death and the Truer, Thorp, Crockwell and Sykes cases, every case on the list had been docketed

for trial one or more times before it was disposed of, and with these exceptions the defendant Laughren either tried the case or negotiated the settlement where they were disposed of in that manner. Four or five cases were completely tried and in some of the others juries were impaneled but the cases were settled before final submission. But the plaintiff says defendant is entitled to compensation only in cases tried to a successful conclusion; that the defendant is entitled to nothing for a settlement negotiated during or prior to trial. A contract of the sort for which plaintiff contends would not only be an unreasonable and improvident one for the trial attorney and contrary to usual experience in the handling of cases on a contingent fee basis, but would tend to create an atmosphere, if not an obligation, on the part of the trial attorney (if he is to receive any compensation) to try all cases to a jury verdict contrary to the admonition of S.Ct. Rule 4.08, V.A.M.R., that: "Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation."

The decision we have reached as to the contract and its terms necessarily disposes of several of the questions presented by the plaintiff. In this category are the assignments that the trial court erred "in its findings of defendant's purported charges against plaintiff" in that they were not supported by the evidence; that the court erred in holding that the plaintiff was bound to compensate the defendant "for services other than the actual trial of cases which were given to him for that purpose" because the "only offer of employment tendered to him was for actual trial of jury cases" and the defendant had no authority to negotiate settlement of cases; that the court erred in denying the plaintiff "full compensation for the proportionate part of the fees earned through his individual services after the death of his partner"; that the court erred in allowing the defendant additional compensation as the original attorney in the Mayor case, and that the court

erred in making an allowance to the defendants in the Pierce and Harris cases and the cases against the Illinois Terminal except the Donahoo case. In support of these contentions the plaintiff cites us to elemental rules of law such as the one that an offer must be accepted in the terms made or it is considered rejected and no contract results. We are also cited to decisions involving partnerships and the winding up of partnerships for the practice of law as in Creason v. Deatherage, 325 Mo. 661, 30 S.W.2d 1, and Creason v. Harding, 344 Mo. 452, 128 S.W.2d 1179. We have no quarrel with any of the authorities cited, but the fact is they are not directly relevant to the issues as we find them. After the dissolution of the partnership by Mr. Miller on June 1, 1952, both of the parties were available to assist in winding up the partnership business until Mr. Miller died, at which time the plaintiff became the surviving partner and as such competent to enter into contracts for the liquidation of the partnership business consistent with the rights of the estate of his deceased partner and other persons interested. The plaintiff does not contend that the parties were legally incompetent to contract, but denies that the terms of the agreement were as the defendants claim. Therefore, the contentions of the plaintiff referred to above are excluded and denied by reason of the holding made as to the contract and its terms.

The plaintiff further charges that the court erred in denying his motion to reopen the case under S.Ct. Rule 78.01 on the ground that the defendant had made a personal attack upon plaintiff's professional character and that the interest of justice required that plaintiff be afforded opportunity to refute such charges by the testimony of witnesses who were unavailable to plaintiff at the time of the hearings before the referee. The referee held eight hearing sessions at intervals over a period of about eighteen days, and the motion to reopen was not filed until approximately three months after the referee filed his report. Furthermore, the motion does not

give the names of the witnesses nor outline the facts to which they would testify. The court did not err in overruling the motion since the granting of a motion to reopen is largely within the trial court's discretion and it is quite clear that the trial court did not abuse its discretion in denying the plaintiff's motion. Everett v. Clinton County, Mo., 282 S.W.2d 30, 40 [17]; Hecker v. Bleish, 319 Mo. 149, 3 S.W.2d 1008, 1019 [16].

■ After the referee's report was filed and the case was pending in the circuit court on plaintiff's exceptions, the plaintiff filed a motion, purporting to be under S.Ct. Rule 60.01, for an order requiring the defendant Laughren to submit to an examination by a psychiatrist to be selected by the court "in order to enable this court to adequately evaluate the testimony of said defendant in this proceeding." The plaintiff charges that the trial court erred in overruling the motion. This is not a case where the mental or physical condition of a party "is in controversy" as contemplated by Rule 60.01. Kenner v. U. S., 8 Cir., 286 F.2d 208, cited by the plaintiff, obviously is not in point since it is a criminal case in which there was a motion to inquire into the mental condition of the defendant for the purpose of determining whether he had sufficient capacity to stand trial. Nevertheless, the plaintiff contends that such an examination would assist the referee in evaluating the testimony of the defendant. It was for the referee initially to determine if the alleged hostility of the defendant toward the plaintiff had a reasonable basis. Clearly a trial court cannot order a witness to submit to a psychiatric examination any more than it could order him to take a polygraph test. Certainly if the court had the power and the willingness to determine credibility by this means it should be applied to all alike. The credibility of the witnesses (parties or otherwise) was for the referee in the first instance and his ability and long experience as a circuit judge well qualified him for the task.

The motion was without any reasonable foundation and was properly denied.

■ Two of the plaintiff's assignments of error are related and will be treated together. They, in effect, charge that the trial court erred in ruling that the partnership of Miller & Landau was "terminated" on June 1, 1952, and in treating the terms "dissolution" and "termination" as though they were synonymous because a partnership is not "terminated" until the business of the partnership had been completely liquidated and wound up. While the word "terminated" was sometimes used during the course of the hearings and in the referee's report, the plaintiff overlooks the fact that the referee in his conclusions of law expressly stated that the partnership was "dissolved" by Mr. Miller as of June 1, 1952. In common parlance "termination" is sometimes used to indicate a change in the status of a partnership when "dissolution" would be legally correct. There is no showing that the referee misunderstood the relevant rule of law or misapplied it. The charge of error is strained and fastidious. It is without merit and is denied.

Finally the plaintiff contends that: "Upon the basic theory of unjust enrichment, plaintiff was entitled to receive, as the surviving partner, one-half of the amount of the partnership funds which had been expended for the purchase of the law books which comprised the partnership's library, and the trial court erred in refusing to credit plaintiff with the amount so expended out of partnership funds." The plaintiff himself testified that the library originated with law books owned by Mr. Miller but states that $1,274.64 of partnership funds had been invested in the maintenance of the library at the time of Mr. Miller's death. There was evidence tending to show that the partners had agreed that the firm would use the books and that any replacements or additions made out of partnership funds would become the property of Mr. Miller, thereby compensating

him for the use of his library. The plaintiff himself testified that in November 1950 he stamped the firm name of Miller & Landau in the front cover of all the books in the library and that Mr. Miller upon discovering this had called the plaintiff at his home on a Sunday afternoon and complained of the plaintiff's action; that the plaintiff told Mr. Miller that he had done so because books borrowed from the library by other lawyers had not been returned and that he felt if the firm name was inside the books the borrowers would remember where they had obtained the books and there would be a better chance of their being returned. At Mr. Miller's insistence the plaintiff wrote and delivered a note to Mr. Miller stating that he, the plaintiff, had not intended to deprive Mr. Miller of his interest in the books and that the plaintiff was willing to paste labels over the firm name or stamp Mr. Miller's name in the books.

In his written argument the plaintiff concedes that ownership of the library "in the sense of determining title, is not necessarily involved in this suit"; he bases his claim to half of the expenditure on the theory of unjust enrichment, citing in support of his contention the cases of Straube v. Bowling Green Gas Co., 360 Mo. 132, 227 S.W.2d 666, 670 [4], 18 A.L.R.2d 1335, Minor v. Lillard, Mo., 289 S.W.2d 1, 3 [3], and Toalson v. Madison, Mo.App., 307 S.W.2d 32, 34–35 [1,2]. This is not a proper case for the application of the doctrine of unjust enrichment. The arrangement is not an unusual one in the practice of law by partners. There was no mistake or unexpected result and the amount expended by the firm over the period of seven years prior to Mr. Miller's death is not exorbitant or unreasonable. If the plaintiff was dissatisfied with the arrangement concerning the library he should have told Mr. Miller so in November 1950 when the matter of marking the books was being discussed. There is no evidence that he did so. The plaintiff has shown no grounds for relief; the courts cannot undertake to make a new

contract for the plaintiff but must enforce the agreement as the parties made it. Monticello Bldg. Corp. v. Monticello Inv. Co., 330 Mo. 1128, 52 S.W.2d 545, 551 [10]; Blanke Bro. Realty Co. v. American Surety Co., 297 Mo. 41, 247 S.W. 797, 801 [2].

We have considered all of the appellant's assignments of error and finding them to be without merit they are denied. The judgment is affirmed.

All of the Judges concur.