D. A. OSGUTHORPE, Plaintiff-Appellee,

v.

ANSCHUTZ LAND AND LIVESTOCK COMPANY, Inc., a corporation, Defendant-Appellant.

No. 71-1296.

United States Court of Appeals, Tenth Circuit.

March 20, 1972.

Winner, District Judge, dissented in part and filed opinion.

Merlin O. Baker of Ray, Quinney & Nebeker, Salt Lake City, Utah (Edward W. Clyde of Clyde, Mecham & Pratt, Salt Lake City, Utah, on brief) for defendant-appellant.

George M. McMillan of McMillan & Browning, Salt Lake City, Utah (E. Nordell Weeks of McMillan & Browning, Salt Lake City, Utah, on brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, DOYLE, Circuit Judge, and WINNER, District Judge.

WILLIAM E. DOYLE, Circuit Judge.

This case involves distinct but not unrelated claims filed and prosecuted by appellee. The first of these involved an alleged balance due for sheep sold to appellant; a verdict in the amount of $9,797.06 was awarded by the jury. The second claim was for professional services allegedly rendered by appellee in connection with the nerve gas poisoning of appellant's sheep by the Army at Skull Valley, Utah in March 1967. The recovery on this second claim was in the amount of $28,090.00, which sum included interest. The alleged errors relied on by appellant for reversal involve certain of the court's instructions and, at the same time, the failure of the court to instruct in accordance with Anschutz's theories. It is necessary to summarize the facts somewhat extensively in order to fairly consider the parties' contentions.

I.

Dr. Osguthorpe was shown to have been a veterinarian who also had a sheep ranch. In 1967 he obtained an interest in a flock of 2,300 sheep of J. R. Broadbent by providing a summer range. In the middle of the summer he, with the authorization of Broadbent, contacted Alvin Hatch, manager for Anschutz, as to possible purchase of the sheep. The testimony as to what occurred in connection with this sale is diametrically opposed and raises questions as to the terms of the sale.

Osguthorpe testified that when he met with Hatch in the summer of 1967 at Kimball Junction, Utah, he and Hatch orally agreed on a flat price of $25.00 per head. Hatch, on the other hand, insisted that the price agreed upon was based on the age of the sheep—$28.00 for two-year-olds, $23.00 for three-year-olds, $18.00 for four-year-olds and $14.00 for five-year-olds and above. Hatch further said that he made a memorandum of these prices,[1] and that Osguthorpe agreed to draw up a written contract to such effect at a later time. Osguthorpe's testimony was that the first mention of any price per age was made in a written contract which the livestock company submitted to him in the fall of 1967. According to his further testimony, neither he nor Broadbent signed this.

The livestock company's office manager at Wasatch, Utah, one Miles Williams, testified to a meeting on September 12, 1967 at Wasatch. Both Osguthorpe and Hatch were present, and this was for

[1] This was not produced at trial, but Hatch testified that the subsequent bill of sale and draft agreement were drawn up from it.

the purpose of signing a contract. It was not, however, signed since it was determined that the signature of J. R. Broadbent was necessary. Instead, a contract was prepared and given to Osguthorpe for Broadbent's signature. On that occasion, according to Williams, a bill of sale listing the number and price of the sheep per age was given to Osguthorpe who made no protest about price.[2] Hatch, on the other hand, testified that before payment was made by issuing a second check to Osguthorpe, there was a telephone conversation in which Osguthorpe said that Broadbent had signed the written contract.

An initial payment in the form of a check for $2,000.00 in which J. R. Broadbent was the payee was given on behalf of the livestock company on September 12, 1967. Inspection of the sheep took place in October, and 1,674 head of the 2,300 flock were delivered and accepted. On November 15 a check in the amount of $31,641.00, also payable to J. R. Broadbent, was issued by Anschutz and delivered to Osguthorpe. Approximately seven months later Osguthorpe demanded an additional $8,029.00 from the livestock company, claiming that this was the unpaid balance due. Anschutz refused to pay this, and whether this amount was due and owing was the first dispute tried. The sheep were in fact mouthed and the ages of the sheep determined by Anschutz before payment was made. Osguthorpe, however, plays down the significance of this circumstance because he maintains this was necessary for eliminating the old sheep which could not make it through the winter.

At the trial Osguthorpe presented two alternative theories. First, that there was an oral agreement at Kimball Junction and, secondly, that if there was no meeting of the minds he was nevertheless entitled to recover in the amount demanded on a quantum meruit basis. Anschutz's contentions were somewhat less clear. It relied on the execution of a written agreement based on the testimony outlined above, including the alleged admission by Osguthorpe that Broadbent had signed a contract. When all of the evidence was in, the attorneys for Anschutz advised the trial court that they wished also to rely on an oral agreement entered into at Kimball Junction keying the price to the age of the sheep, but the trial court stated in response that the company's only evidence was in support of a written contract, a writing which had not been produced and which, according to the further ruling of the court, could not be considered since there had not been a delivery.

In outlining the issues as a part of its jury charge, the trial court described the Osguthorpe contention as being that Hatch orally agreed to pay the sum of $25.00 per head regardless of age and also told the jury that if the jury found that there was no oral agreement as to price or no written agreement as to price, that the plaintiff was entitled to recover the fair and reasonable value of the sheep at the time of their delivery in the fall of 1967. In setting forth the contentions of the defendant, the court merely said that the defendant denied that its agents or employees or that its Utah superintendent, Hatch, orally agreed to pay $25.00 per head. The court continued:

\* \* \* The defendant instead says that the agreement discussed was not for $25 a head, but it was a different price for different age groups of ewes. And the defendant further claims in this lawsuit that the parties did not intend to enter into an agreement up there in Summit County as to price nor until it was written down on a piece of paper, signed by the plaintiff. The defendant claims there was

---

2. Osguthorpe, on the other hand, testified that he attended no such meeting, and the reason that he did not protest the pricing based on classifications was that

he thought that he had an agreement and that this was merely an effort to revise the terms of it.

such a written agreement, but the defendant did not produce a written agreement at the trial.

Thus, the sole contention of the defendant submitted to the jury was the contention that a written agreement was intended. The jury was not even told that it was at liberty to decide for the defendant if the jurors found that the plaintiff had failed to prove *any* agreement, or if the jury found that there was in fact an agreement based on the age of the sheep or if it determined that the parties entered into a parol agreement evidenced by the bill of sale and the submitted writing.

■ Moreover, the court's view as expressed in its definitive ruling that the contract to be valid and enforceable had to have been delivered back to Anschutz was a mistaken view of the law on the subject since delivery is not necessary in the absence of an express intention. The important factor is whether the parties arrived at a meeting of the minds.[3] The view expressed by Corbin (see note 3, *supra*) is carried out by the Utah Commercial Code—derived from the Uniform Commercial Code—which recognizes that a contract can come into being as a result of either a writing or words or conduct. 70A–2–204(1) Utah Code Ann.1953. Moreover, according to § 70A–2–203, sealed instruments are not approved. The official commentary to § 203 recognizes that the parties may condition

their assent on formalities, but must do so expressly.[4]

Accordingly, it was open to Anschutz to contend that there was a written contract if it was signed, even though there was not delivery, or, in the alternative, it could contend that there was an oral agreement evidenced by the draft and the bill of sale.

We do not gainsay that the plaintiff had the right to have the jury consider whether the parties intended to ultimately have a written agreement which never came into existence. So also, however, the Anschutz testimony as to an admission by Osguthorpe that Broadbent had signed the contract was pertinent to the Anschutz theory that there was a written contract embodying its price theory. Further, there was the testimony that Osguthorpe delivered the sheep with notice (the bill of sale and draft contract) that Anschutz contemplated payment according to age.

All of this evidence called for submitting to the jury questions as to whether the agreement was in truth in accordance with the testimony of the Anschutz agents, Hatch and Williams.

■ We note that Anschutz did not submit an instruction which specifically told the jury of its reliance on an oral contract, but, as previously noted, it did bring this matter to the attention of the court. But the judge refused to recognize this claim, apparently believing that the evidence did not justify any issue

---

3. One of the necessary requirements of a contract under seal is delivery.

.    .    .    .    .

The term "delivery" is also in use with respect to written contracts not under seal; but there is even less reason to assert that it is a necessary requirement. At common law, the sealed instrument was given a special legal operation, beyond that of an ordinary informal contract; and delivery was required, not merely as a manifestation of assent to the terms of agreement, but also as an assent to the document itself as a "specialty" with its special operation. All that is necessary to the creation of an informal contract, wheth-

er reduced to writing or not, is an expression of assent in any form. The writing itself is not necessary; if put in writing, a signature is not necessary; and even if in writing and signed, a delivery is not necessary. It is an expression of assent that is required. Delivery of a writing may be sufficient evidence of such an assent; but words of assent are sufficient, and conduct other than delivery may also be sufficient. 1 Corbin on Contracts § 32 at 125–126 (West 1963).

4. Official Commentary to § 203, 1 Uniform Laws Annotated, Uniform Commercial Code 107 (West 1968).

other than whether a written contract (which was not produced) had been intended. The written contract was erroneously ruled out because it was not shown to have been delivered by Osguthorpe, and the oral approach was not submitted. As a consequence, the Anschutz company was precluded from advancing any tenable defense. Under the instruction as given, the defendant was blocked out and frustrated in advancing a defense, and the jury had to decide for the plaintiff on his version of the contract or, in the alternative, on a quasi contract theory. Also, it was error for the court to refuse to give defendant's requested instruction number nine,[5] and defendant's requested instruction number 12.[6] The refusal of the court to instruct at least in accordance with these offerings further circumscribed Anschutz in the defense of its claim. This same narrow scope of the issues was repeated in the court's charge as to damages.[7]

■ A further contention is that the court erred in receiving in evidence data furnished by defendant to the Army concerning the value of the sheep injured by the nerve gas. In our view, reception of this evidence was within the discretion of the trial court as bearing on the reasonable market value of the sheep as of October 1967 when they were delivered to Anschutz. Since the plaintiff seeks recovery on a quantum meruit basis, this evidence is relevant.[8]

---

5. Defendant's requested instruction number nine said in pertinent part:

> If you find that the plaintiff was not the owner of the sheep sold and delivered, *or that the purchase price agreed upon has been paid by the defendant*, then you must return a verdict in favor of the defendant and against the plaintiff on the plaintiff's claim for money owed on the sale of sheep to the defendant. (A. 13) (Emphasis added).

6. The defendant also requested instruction number 12 which was not given:

> You are instructed that it is not necessary for a written contract in order to be valid and enforceable that said contract be delivered back to the party who submitted the contract to be signed. If you find from the testimony that J. R. Broadbent signed the written contract even though it was not delivered back to the defendant, you may find the issues on the purchase and sale of the sheep in favor of the defendant and against the plaintiff. (A. 14).

7. With respect to plaintiff's claim for the payment for the sheep, the court charges you as follows:

> If you determine by a preponderance of the evidence that the defendant Anschutz Land & Livestock Company, or its agents or employees, agreed orally to pay the plaintiff the sum of $25 per head for the ewes sold by the plaintiff to the defendant, you may award judgment to the plaintiff and against the defendant on this portion of plaintiff's claim in the sum of $8,029.
>
> The court charges you that the evidence establishes that the defendant took delivery of the sheep pursuant to an agreement between the parties whereby plaintiff sold the sheep to defendant. The law does not require that the plaintiff produce a written agreement with the defendant whereby the price of the sheep was established.
>
> If you determine by a preponderance of the evidence that the oral agreement was that the defendant should pay the sum of $25 per head, regardless of the age of the sheep, you should award to the plaintiff damages on this portion of the plaintiff's claim in the amount of $8,029.

8. The value would be the reasonable price at the time of delivery, not what defendant was able to obtain from the Army one year later. See 70A-2-305(1) & (4) Utah Code Annotated 1953, Replacement Volume:

> § 2-305. Open price term
>
> (1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
>
> (a) nothing is said as to price; or
> (b) the price is left to be agreed by the parties and they fail to agree; or
> (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
>
> \* \* \* \* \*
>
> (4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a

On retrial the jury should be clearly instructed that such evidence can be considered by it only to the extent that it reflects the market value of the sheep in October 1967 and, of course, only as it bears on the plaintiff's quantum meruit theory, but if the jury finds and determines that there was an express contract, oral or written, such evidence would not have any relevance and could not be considered by it.

## II.

■ The remaining matter is the validity of the award in the amount of $28,090.00 for services rendered allegedly to defendant-appellant incident to the prosecution of its claim against the government for the destruction in March, 1968 of 6,249 head of sheep. The prosecution of this claim by Anschutz was successful in that a settlement in the amount of $376,000.00 for the sheep and $198,000.00 for loss of revenue and diminution of land value was obtained.

The Army did not readily admit its responsibility in the incident and, indeed, Dr. Osguthorpe's investigation resulted in a diagnosis that the death of the sheep was caused by organic phosphate poisoning. Moreover, his subsequent investigation established that the Army's nerve gas test produced the injury. This test was conducted on a windy day and gas was released at a considerable altitude. This was due to the fact that the tanks containing the gas failed to close as the plane gained altitude after releasing part of the substance over the test grid.

As in Claim I, the question was whether a contract existed between Osguthorpe and the livestock company, and it boiled down to whether Osguthorpe's activities were on behalf of the State of Utah which had hired him in the first instance, or performed on behalf of the livestock company. There is no contention as to any formal hiring of Osgu-

thorpe, nor was it suggested that there was any basis for compensation, and hence the plaintiff's theory was that it was an informal implied contract of employment, whereby he would be paid for the reasonable value of his services. Plaintiff maintained that Hatch, the foreman for the livestock company, agreed generally to compensate him for his services and that this agreement took place before the investigation started. In the alternative, he contended that although he started the investigation on behalf of the State, he continued it at Hatch's request for the purpose of fixing the source as well as the cause of death.

It was the defendant's position that the plaintiff came upon its land as a representative of the State of Utah and that his activities were wholly on behalf of the State; and so, even though defendant requested that Osguthorpe make investigations on the Anschutz property, the request was to him as a representative of the State of Utah and it was not intended that he be hired to perform service on behalf of Anschutz. As noted above, Osguthorpe testified that Hatch orally promised that he would be paid and thus made clear an intention on the part of Anschutz to employ him. There was ample evidence also to support the Anschutz theory that Osguthorpe acted only on behalf of Utah. Hatch's testimony was that he merely agreed to Osguthorpe's coming into the area, that this conversation over the telephone in which he assented to Osguthorpe's making an investigation was necessary because of their having had a misunderstanding before that time. Hatch denied that he had intended to employ Osguthorpe or that he had promised to pay. Hatch's testimony was corroborated, somewhat at least, by Agiculture Commissioner Waldron of Utah who testified that he employed Osguthorpe because at that time Utah did not have a state veterinarian.

case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the

time of delivery and the seller must return any portion of the price paid on account.

Thirdly, there was a strong circumstance in favor of Anschutz: Osguthorpe testified before a Congressional committee that he was the official representative for the State of Utah, and, although this was long subsequent to his conversation with Hatch, he made no mention of any employment by Anschutz. He had an explanation for this also; that he had to use his official commission in order to be able to conduct negotiations and dealings with the government agencies involved.

Anschutz argues here as it did in Claim I that the trial court erred in failing to plainly submit its theory of defense to the jury. The trial court instructed the jury that if the defendant requested the plaintiff to render services for it and if the plaintiff, pursuant to that request rendered such services, then he was entitled to the fair value of the services so rendered, notwithstanding that he may also have been employed by the State of Utah.[9]

Anschutz maintains that it was open to the jury to return a verdict for the plaintiff based solely on their having *requested* that he come on the property regardless of whether the jury believed that he did so as an employee of Utah and regardless of Anschutz's intention to employ him. It may be that the charge quoted above could have delineated this issue with more clarity than it did. The term "request", for example, is somewhat ambiguous, for if Osguthorpe was requested to carry out his investigation solely as a Utah official, there could not have been an employment contract with Anschutz.

Had the charge been limited to the first and second paragraphs quoted above, there would be substance to the

---

9. The complete text of the charge in question is as follows:

With respect to plaintiff's claim for the fair and reasonable value of his professional services rendered to the defendant, the court charges you that, if you find from a preponderance of the evidence that the defendant, or the defendant's employees or its superintendent of Utah operations, requested that the plaintiff perform services in connection with determining the cause of the death of defendant's sheep, or that the defendant requested that the plaintiff perform services in connection with determining that the United States Government was responsible for the death of the sheep, you are instructed that the plaintiff is entitled to recover the fair and reasonable value of the services he performed pursuant to such request, and it is not necessary, and the law does not require, that the plaintiff prove a written contract between the parties to enable the plaintiff to recover.

With respect to plaintiff's claim for payment—or with respect to plaintiff's claim for the fair and reasonable value of professional services rendered, the court further charges you that, if you determine from a preponderance of the evidence that the plaintiff rendered services to the defendant in connection with the determination of the cause of death of defendant's sheep or the fixing of the blame of such death on the Army, or the United States, plaintiff is entitled

to recover the fair and reasonable value of his services rendered pursuant to such request. The fact that plaintiff may have been employed by the State of Utah does not excuse the defendant from its obligation to pay for plaintiff's services if the plaintiff was requested by the defendant to render other or additional services, or if his services were performed both for the State and the defendant.

The court further charges you, ladies and gentlemen, that, if you determine that the plaintiff offered to render services to the defendant and the defendant accepted that offer, the defendant is liable for the payment of reasonable compensation for any services rendered by the plaintiff in defendant's behalf to the same extent as if the defendant had made the offer and it had been accepted by the plaintiff. If you find that the plaintiff initiated a telephone call to the defendant's Utah manager, Alvin Hatch, on March 19, 1968, in which the plaintiff offered to render services and Mr. Hatch indicated that defendant did desire such services to be rendered, the defendant is liable for the fair and reasonable value of his services.

If you find that thereafter Mr. Hatch requested that plaintiff render services or pursue the matter with the Army, the defendant is liable for the reasonable value of services rendered pursuant to any such requests.

contention of Anschutz. However, the next paragraph speaks of an offer to render service and acceptance of such an offer by Anschutz, and thus it does more than hint that the jury has to find an employment contract. Moreover, the definitive portion of the court's charge, which portion described the claims more clearly, expressed the necessity for a jury finding that there must have been a specific request by Anschutz that the plaintiff perform services on its behalf in order for the plaintiff to be compensated. In this regard the court told the jury:

> Now, plaintiff's second claim is that the defendant or the defendant's employees or the defendant's superintendent of Utah operations, Hatch, requested that the plaintiff perform services as a doctor of veterinary medicine, a specialist in disease of sheep, in connection with determining the cause of death of plaintiff's sheep —the cause of the death of defendant's sheep, and the defendant requested that the plaintiff perform these professional services in connection with determining that the United States Government was responsible for the death of the sheep; that the plaintiff did perform those services and that the plaintiff is entitled to recover against the defendant the fair and reasonable value of the services that plaintiff performed pursuant to such request.

> Now, again, on the other hand, the defendant denies that it made any request of the plaintiff to perform services and denies that it made any agreement to pay Dr. Osguthorpe, the plaintiff, for his services. Instead, the defendant Anschutz Land & Livestock Company asserts that the plaintiff, Dr. Osguthorpe was in the employ and working for the State of Utah.

■ Unquestionably a party is entitled to an instruction setting forth his theory of the case. See Clifton v. Mangum, 366 F.2d 250, 253 (10th Cir. 1966).[10] However, we cannot say that the charge in question read in its entirety deprived the defendant of its theory that Osguthorpe was used by it only in his capacity as a veterinarian for the State of Utah. While the charge could have been fashioned so that it expounded defendant's theory in clearer relief, it does not follow that it was uncertain or inadequate under the circumstances.

Finally, the $25,000.00 fee is challenged, and while it does appear somewhat high, at least to the uninitiated, the fact remains that extensive and skillful services were furnished, and Anschutz reaped the benefit of those services to a considerable degree.

■ Nor can it be said that Osguthorpe was an incompetent witness as to the value of his own services. His testimony was enhanced by the fact that Anschutz offered no evidence on this point. Nor can we agree that Osguthorpe was disqualified as an expert witness because of his being a party. See Hardt v. Heller Bros. Co., 72 F.Supp. 795, 799 (E.D.Pa.1947), modified on other grounds 171 F.2d 644, 648-649 (3rd Cir. 1948).

■ It is the fact just mentioned, that Anschutz derived great value from the services rendered in obtaining a most favorable settlement from the Army, which is at last argued as erroneous receipt of evidence. We disagree. This evidence was germane to the issue of the reasonableness of Osguthorpe's fee; receipt of it was not an abuse of discretion.

■ We have considered also the issue whether it was reversible error to tell the jury that the State of Utah

---

10. In the above cited opinion this court said:

. . . [F]or a party is entitled to an instruction based on his theory of the case if there is evidence in the record to support it. See Blassingill v. Waterman Steamship Corporation, 9 Cir., 336 F.2d 367, 368.

could not and would not pay for services rendered to private parties such as Anschutz. The instruction further told the jury that the State was prohibited from using state funds for private purposes. This evidence was somewhat less relevant than that just considered. However, we fail to see that Anschutz was prejudiced by it, whereby we would be justified in reversing the case on this basis alone.

The judgment as to Count I discussed above is reversed. The judgment as to Count II, the employment contract, is affirmed, and the cause is remanded for a new trial on Count I.

WINNER, District Judge (dissenting in part).

I concur in the reversal of the judgment entered on the first claim, but I respectfully dissent from the affirmance of the judgment on the second claim. I agree that under the record made, the jury could find that plaintiff was entitled to recover the reasonable value of his services to defendant, but I disagree as to the factors which could be considered by the jury in fixing that reasonable value.

The jury was instructed that if plaintiff performed services for defendant "in connection with the determination of the cause of death of defendant's sheep or the fixing of blame of such death on the United States or the Army, plaintiff is entitled to recover the fair and reasonable value of his services." The jury was told that it could consider as factors in arriving at its verdict:

"4. The part or role which the plaintiff played in fixing the cause of death of the defendant's sheep.

"5. The causal relationship, if any, between the services performed by the plaintiff and the amount of recovery which the defendant obtained from the United States Government as a result of the death of defendant's sheep.

"6. The value of the benefits, if any, derived by the defendant from the plaintiff's services in determining the cause of death of the sheep, if plaintiff did assist in determining such cause."

At least some courts have adopted the rule that benefit to the defendant is not the measure of the reasonable value of services [See, United States for Use and Benefit of Citizens Nat. Bank v. Stringfellow (5 Cir. 1969) 414 F.2d 696] but my disagreement with the majority does not require adoption of that line of authority.

The "part or role which plaintiff played in fixing the cause of death of the defendant's sheep" was twofold. He conducted an investigation and he testified as an expert witness before a Congressional Committee. The services mentioned in the "causal relationship" instruction include his expert testimony, and the "value of the benefits derived by the defendant from plaintiff's services" include benefits derived from that same most effective testimony. In the trial below, plaintiff was permitted to express the opinion that his services were worth $25,000.00, and he based that opinion in part on "the fact that they were able to recover their loss from the Army without litigation which was very advantageous to the client."

Thus, the Court is indirectly saying that the persuasiveness and effectiveness of an expert's testimony may be used by a jury as a factor in fixing the expert's compensation. If the contract were express rather than implied, and if the express contract were that the expert would be paid a larger fee if his client won the case than he would be paid if his employer lost the case, the contract would be semi-contingent and it would be void as against public policy. 31 Am.Jur.2d, Expert and Opinion Testimony § 12, p. 507; 16 A.L.R. 1464; 41 A.L.R. 1323; 45 A.L.R. 1423; Wright v. Corbin (1937) 190 Wash. 260, 67 P.2d 868; Barnes v. Boatman's Nat. Bank of St. Louis (1941) 348 Mo. 1032, 156 S.W. 2d 597; Sherman v. Burton (1911) 165 Mich. 293, 130 N.W. 667.

The instructions permit plaintiff to recover under an implied contract for something which could not be awarded him under an express contract. I do not think that evidence of the favorable results stemming from plaintiff's testimony before the Congressional Committee or the amount of his client's financial recovery should have been presented to the jury, and I do not think that the gratifying results of that prior testimony were a factor to be considered by the jury in fixing the reasonable value of plaintiff's compensation.

Expert witness fees should not be made commissionable, but I fear that such is the impact of the majority opinion.