Frank PARISH and Doral Parish, Respondents,

v.

Frank USKALI and Alice J. Uskali, Appellants.

No. 50749.

Supreme Court of Missouri,

Division No. 2.

Sept. 13, 1965.

Neale, Newman, Bradshaw, Freeman & Neale, O. J. Taylor, Springfield, for respondents.

Anthony P. Nugent, Jr., Kansas City, Donnelly & Donnelly, Lebanon, Winger, Nugent, Rayburn & Adams, Kansas City, of counsel, for appellants.

STOCKARD, Commissioner.

This is an appeal by defendants from a judgment favorable to plaintiffs in their suit for a declaratory judgment to construe a contract and against defendants in their counterclaim wherein they sought rescission of the contract and actual and punitive damages in the amount of $200,000.

Defendants Frank Uskali and Alice J. Uskali, his wife, were the owners of a tract of undeveloped land situated on the shores of the Lake of the Ozarks on the Little Niangua arm of the lake in Camden County. Their land included what was known as Big Island which had about three miles of shore line and was joined to the mainland by a narrow neck of land. Although defendants had plans for the commercial and residential development of

their land, they were not able to finance the development themselves, and prior to 1959 had not been able to interest anyone else in developing it.

In 1959, after discussion and negotiation, plaintiffs and defendants entered into a contract dated July 1, 1959, wherein it was agreed that plaintiffs would develop ·Big Island and sell lots to the public. Plaintiffs agreed to pay to defendants $5,000 in cash, and to pay to the First National Bank of Camdenton the sum of $12,000 to retire an indebtedness of defendants secured by a deed of trust on Big Island. Defendants were to give plaintiffs a note for $12,000, with interest at 7% but with no provision for payment except from a portion of defendants' share of the proceeds of the sale of the lots. It was also provided that plaintiffs were to pay "all costs of promotion and development of said lands for sale to the public." Plaintiffs and defendants were each to receive one half of the proceeds from the sale of the lots. Paragraph 2 of the agreement, about which the parties cannot now agree as to its meaning, is as follows: "First parties [defendants] agree that Second Parties [plaintiffs] shall have complete control and authority over the development and sale of said lands with no hindrance from any party whatsoever and Second Parties shall devote their best efforts to such development and sale."

On August 4, 1959, the parties executed what was entitled a "Modification and Addendum to Contract." In it the legal description of Big Island was set forth, and among other things it was provided that plaintiffs "shall not sell any lots fronting on the Lake of the Ozarks for less than Eighteen Dollars ($18) per lake front foot" unless by agreement of the parties or as the result of the decision of a named arbiter, and further, that because the market value of lots may fluctuate the parties should meet at such times and places as are mutually agreed upon to confer about property valuations. It was express-

ly provided that "with the exception of the matters herein contained" the contract dated July 1, 1959, "shall in all other respects remain valid, binding, and enforceable." Other provisions of the two contracts will be mentioned in the course of this opinion.

Plaintiffs paid the $5,000 to defendants and the $12,000 to the bank, and defendants executed the note. Plaintiffs then spent approximately $11,000 in developing the land and advertising the lots for sale. R. W. Vincent, admittedly a competent surveyor and engineer, was employed by plaintiffs to lay out a subdivision composed of 65 lake front lots entitled Big Island Lake Sites. A plat of the subdivision was prepared, and defendants signed and acknowledged it for recording in the office of the county recorder of deeds. At the same time there was also prepared by plaintiffs and executed and recorded by defendants an instrument entitled "Restrictions and Conditions Affecting Big Island Lake Sites," which provided, among other things, that no "commercial building" should be erected on any lot unless the plans and specifications be first approved by the "Dedicators," identified as the defendants, and that no "residential building" should be erected on any lot unless the plans and specifications "have first been submitted to Frank Parish of Camden County, Missouri, the Developer," for his approval. No objection by defendants was made to the above plat or to the restrictions.

After a substantial number of lots in Big Island Lake Sites were sold, plaintiffs again employed R. W. Vincent to lay out a second subdivision to be known as Big Island Lake Sites, First Addition. A plat was prepared showing 101 lake front lots of varying sizes and depths. Back of each lot was shown a road named Lake Shore Drive which provided the only access to any of the lots except by water. When this plat was submitted to defendants they refused to sign it until they changed the dedication statement thereon to provide that the subdivision shown by the plat was no

more than a "proposed subdivision," that it was "proposed" that Lake Shore Drive be dedicated to public use, that it was "proposed" that the "proposed lots" be sold subject to restrictions that were to be recorded at the same time, and that "the undersigned owners [defendants] reserve the right to abandon in whole or in part the proposed plat" except a small portion thereof pertaining to Lot 8 and the road leading to it.

At the time the "proposed" plat was recorded defendants recorded a "Declaration of Restrictions" applicable to all of Big Island Lake Sites. The restrictions varied substantially from the restrictions applicable to Big Island Lake Sites, and defendants as "owners" reserved to themselves the right to approve the plans and specifications of all buildings and structures. It is obvious that the ability of plaintiffs to sell lots in the new subdivision was practically eliminated when the location of the only access road to the lots was not fixed and the road was not dedicated to public use, when the size of lots was subject to change, and when plans and specifications for construction of homes had to be approved by persons who did not live in the area and the sale of a lot and approval of plans could not be made at the same time.

It appears that the principal objection of defendants to this second plat, as prepared by Mr. Vincent for plaintiffs, was that in their opinion certain of the lots were too deep. Plaintiffs' explanation, and the explanation of Mr. Vincent, was that these particular lots had a very steep grade running back a little more than 100 feet from the shore line which made the lots undesirable as building sites unless the depth was increased to provide a level area. Appellants' surveyor admitted that the grade was approximately 50% and that it would not be feasible to build a house there.

By their petition plaintiffs sought a declaration that pursuant to the agreement between the parties as evidenced by the instruments dated July 21 and August 4, 1959, (1) plaintiffs have complete authority and control over the development and sale of the land described therein; (2) said authority includes the right of subdividing said land, and the preparing of plats and restrictions and conditions applicable thereto; (3) defendants were bound and obligated under said contract to execute the plat to Big Island Lake Sites, First Addition, in the form presented to them by plaintiffs, and to execute restrictions and conditions applicable thereto which would be identical in substance to those theretofore executed with respect to Big Island Lake Sites; and (4) defendants were without right to alter the aforesaid plat, in the manner they did, or to file a declaration of restrictions differing in any material respect from the restrictions and conditions theretofore executed by them.

In defendants' answer they denied "the execution of a valid and enforceable contract" and stated that the instruments dated July 1 and August 4, 1959 are nullities "in that (1) at the time of the execution of each of said instruments, each of the defendants lacked the legal capacity to enter into a contract because each defendant was then suffering from mental illness, (2) defendants have never ratified said alleged agreements and acts, and (3) the signatures of each of said defendants to each of said instruments were secured by plaintiff Frank Parish by means of duress, threats and fraudulent representations to defendants at a time when said plaintiff knew defendants were mentally ill." It was also alleged that the agreements "are void for failure of consideration in that plaintiffs have committed numerous serious and substantial breaches of said alleged agreements." Defendants also filed a counterclaim in three counts. In the first count they incorporated the allegations of their answer and prayed that the court enter its decree "rescinding and cancelling said agreements." In the second count they alleged that plaintiffs had breached the agreement in seven respects, and they prayed that the court enter its

decree "rescinding and cancelling the agreements," and that it enter judgment in their favor in the amount of actual damages. The third count was for punitive damages.

After trial before the court without a jury, the trial court filed its memorandum of findings of facts and conclusions of law, the substance of which was that "after observing the defendants for three days during trial of this case, [it] has concluded that they are unusually intelligent and that they were at the time of the execution of the contracts as well informed as the average person about the development of lake property in Camden County, that being financially pressed in 1959 and being desirous of having Big Island developed, they executed the contracts after many discussions during which defendants intelligently discussed the project and made various proposals and counter proposals as to the terms of the contracts, * * *." The court further found that there was "no evidence * * * that plaintiffs fraudulently misrepresented the facts and there is no evidence that defendants executed the contracts under duress or threats, [and] that there is no proof that plaintiffs have breached the contracts so that defendants are entitled to have them rescinded or that defendants are entitled to damages for alleged breach." The court concluded that at the time of signing the contracts defendants "were mentally competent, intelligent persons, that they realized full well the terms of the contracts, that they executed them of their own free will in the absence of any fraud, duress or threats, that the contracts are not unconscionable and that they are enforcible as executed." The court then entered judgment accordingly, and decreed therein that "under a true and proper construction of said contracts, the plaintiffs have complete control and authority over the development and sale of the land described therein, including the right of sub-dividing said land and preparing plats and restrictions and conditions applicable thereto;" that defendants were

"bound and obligated to execute a plat to Big Island Lake Sites, First Addition, in the form presented to them * * * and to execute restrictions and conditions applicable thereto, identical in substance to those theretofore executed by defendants with respect to Big Island Lake Sites." It was then ordered and decreed that defendants place on file with the Recorder of Deeds of Camden County an amended plat to Big Island Lake Sites, First Addition, in the form presented to them by plaintiffs, and that they execute and record conditions and restrictions applicable to Big Island Lake Sites, First Addition, identical in substance to those recorded with respect to Big Island Lake Sites.

In the first point in their brief defendants assert that the trial court erred in ruling that the contracts were supported by adequate consideration and that they were not unconscionable. We do not agree.

■ In regard to the issue of adequate consideration, defendants present no reasons in support of their contention in either the point in their brief or in the argument. We find that the consideration moving from plaintiffs to defendants was substantial. Plaintiffs paid to defendants $5,000 in cash, and they also paid a $12,000 note owed by defendants with no duty on the part of defendants to repay that amount to plaintiffs except from a portion of their share of the proceeds of the sale of lots. Plaintiffs were required to pay "all costs of promotion and development," which at time of trial amounted to $11,000, with no right to charge any part thereof to defendants, and plaintiffs promised to "devote their best efforts to such development and sale." In addition, defendants were to receive one half of the proceeds from the sale of the lots with no work or investment of money on their part. There is no evidence of the value of the land in its undeveloped condition or as to the original cost to defendants.

The above statement of the consideration moving from plaintiffs to defendants, with-

out the need for discussing the basic principles involved, establishes beyond doubt that the contracts were supported by adequate consideration. See Vondera v. Chapman, 352 Mo. 1034, 180 S.W.2d 704; Brown v. Weare, 348 Mo. 135, 152 S.W.2d 649, 136 A.L.R. 286; 17 Am.Jur.2d Contracts § 92. In addition, there can be no possible basis for a contention that the consideration moving from plaintiffs to defendants is so disproportionate from the consideration moving from defendants to plaintiffs that the contracts are unconscionable, and we do not understand defendants to so contend.

■ Defendants' argument in support of their contention that the contracts are unconscionable is directed solely to the proposition that "each of the defendants lacked the legal capacity to enter into a contract because each was then suffering from mental illness." Defendants' contention necessarily is that the trial court arrived at the wrong conclusion concerning the mental capacity of defendants at the time they executed the contracts, and that a contract entered into with persons with the mental capacity then had by defendants is unconscionable. However, although the trial court expressly found as a fact that at the time the contracts were executed defendants were mentally competent, neither in their motion for new trial nor in a point in their brief do they expressly challenge that finding. Neither do they specifically assert that the evidence of their competency is not sufficient to support the judgment, and there can be no question whatever but that it is. Testimony of persons who were with them at the time, and who negotiated with them concerning the terms of the contracts, was clear, concise and substantial to the effect that they acted and spoke rationally, and that they displayed an unusual ability in discussing the terms of the contracts. Therefore, the issue really is whether in our review pursuant to Civil Rule 73.01(d), V.A.M.R., of the case upon both the law and the evidence we would reach a conclusion as to the mental capacity of defend-

ants different from that of the trial court. However, we are admonished by the rule that a judgment is not to be set aside unless clearly erroneous, and that due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Mrs. Joan Jordan, the daughter of Mrs. Uskali and the stepdaughter of Mr. Uskali, testified by deposition that both defendants were highly intelligent and that she did not know of any diagnosed mental difficulties of either of them prior to July 1959. She then testified that prior to July 1959 there were "a lot of little things that happened" which caused her to believe "something was wrong." She said that defendants were highly suspicious of everybody and thought people were watching them and that their house was "bugged." She also stated that Mr. Uskali was highly excitable and that at times she had trouble in understanding him. When Mrs. Uskali signed the contract dated July 21, 1959, she was living with her daughter in Overland Park, Kansas, and was working. Mrs. Jordan related that her mother had a "complete breakdown" on Easter Sunday in 1960, which resulted in medical treatment and shock treatments. On the other hand Mr. Parish and Mr. Low, an attorney, testified that during the negotiations of the contracts Mr. Uskali was rational and that they could understand him at all times. Both defendants testified, and the trial court had the opportunity to observe them on the witness stand. From their testimony we find that at the time the contracts were negotiated, Mr. Uskali discussed the terms and suggested changes and made proposals for additional provisions. In his testimony at the trial he unquestionably demonstrated an unusual ability and knowledge concerning the development of lake property. Defendants' counsel refers in the brief to testimony of Mr. Uskali to show "how incomprehensible and rambling" he can be. We do not so construe that testimony. It is our impression from all of his testimony that he is a headstrong person of strong convictions,

and that the particular testimony referred to indicates a studied effort on his part not to confine his answers to the questions asked.

■ When we review all the evidence on the issue of mental capacity of the defendants we conclude that there is more than sufficient evidence to support the judgment of the trial court, and when we review the evidence de novo, and give consideration to the opportunity of the trial court to observe the witnesses, other than Mrs. Uskali's daughter, and to judge their credibility, we necessarily reach the same conclusion as the trial judge, that is, that although defendants displayed an excitable nature and in the case of Mr. Uskali, a tendency to be headstrong, they are unusually intelligent, well versed, extremely careful in their dealings with others, and mentally competent at the time of trial and at the time the contracts were negotiated and executed. We find no merit to defendants' first point.

Defendants' second point is that the trial court erred in ruling "that the contracts had not been breached by the plaintiffs and that defendants were not entitled to have said contracts rescinded or cancelled because in fact there had been numerous breaches of the agency relationship by plaintiffs * * *." The alleged breaches are not set out in the point.

Defendants first argue that they "pleaded numerous, serious and substantial breaches," and they refer to the allegations "that plaintiffs have misused and wasted defendants' property and that plaintiffs have exercised dominion over and appropriated to their own use defendants' property against the interests of defendants." They then add that "Evidence as to these matters was admitted," but they neither set out the evidence nor refer to where it may be found. Defendants did plead that plaintiffs breached the contracts, but pleading alone, when denied as was done in this case, does not constitute proof. Defendants add that "Other serious breaches of the contract were proved at trial," and they set forth several examples which we shall now examine.

■ Defendants assert that their engineer testified to numerous examples of violations of the building restrictions. We find that this witness stated that he found several instances, apparently on Big Island Lake Sites subdivision, where a building was too close to the line. In two instances the adjoining lot was vacant, and as far as is shown by the record the vacant lot may have belonged to the owner of the lot where the alleged violation occurred. There was no showing that Frank Parish approved plans and specifications which included the alleged violations. By the recorded restrictions defendants reserved to themselves, with other owners of the lots, the right to prevent violations. Therefore, if there were violations of the nature testified to by defendants' engineer, defendants were equally at fault, as far as is shown by the record, for permitting them to continue, and of this they will not be heard to complain.

■ Defendants next argue that "Both the engineer and Mr. Uskali testified as to the waste of land involved in moving the road in Big Island Lake Sites, First Addition, back so far from the shoreline." The trial court found that plaintffs had the right to do this under the contracts, and the evidence convinces us that the physical condition of the land justified the decision of plaintiffs to do so. We agree, and we subsequently rule, that the contracts gave plaintiffs that right.

■ Defendants next assert that "plaintiffs had acquired title to certain lots without knowledge of defendants by the exercise of the power of attorney by the person who was given such power in the contracts." Defendants do not point out what provision of the contract they contend was violated. They do not contend that the price was not adequate or proper, or that they did not receive their

share. The evidence shows that a developer frequently builds in a subdivision in order to get the sales of lots started. Other than lack of knowledge until after the transfer of title, defendants apparently have no objection, and at no time did they claim that damage resulted to them. Finally, while cross-examining Mr. Parish at the trial appellants' counsel made this statement: "I would have to make the admission to the court and before you that it was agreed that you had a right to buy any lots you wanted to and build on any lot you wanted to, just as you did down there, * * *."

■ The next contention is that "The court heard evidence of a number of occasions on which plaintiffs built on the property of defendants without notice to or permission of the defendants." No evidence is set out and no reference is made where that evidence can be found. A reference is made to a portion of the transcript where Mr. Parish explained the procedure whereby he sold lots and contracted to build for the purchaser. But, there is no contention that defendants did not get their share of a proper price for the lots, and the record indicates that counsel for appellants approved the procedure followed. We find no merit to defendants' second point in their brief.

■ The third and last point is that the trial court erred in ruling that "a true and proper construction of said contracts gave plaintiffs complete control and authority over the development and sale of the land described therein, including the right of subdividing said land and preparing plats and restrictions and conditions applicable thereto, because under the applicable law of Missouri there was no meeting of the minds of the parties and the intentions of the parties govern ambiguities and such ambiguities should here have been decided in favor of defendants." Defendants have reference to paragraph 2 of the agreement dated July 21, 1959, which in its material part was as follows: "First Parties [defendants] agree that Second Parties [plaintiffs] shall have complete control and authority over the development and sale of said lands with no hindrance from any party whatsoever, * * *." Defendants contend that this provision means that plaintiffs were to "have the right to promote the sale of the land and shall act as the agents of [defendants] for the purpose of selling the lots on the island and shall be free to promote and sell such lots without hindrance from the [defendants], but the [defendants] are in turn free to participate in the planning and development of the island, including the platting and the imposition of restrictions and conditions upon the use of the land." We cannot agree with defendants' interpretation. We are inclined to consider the meaning of paragraph 2 to be plain, clear and unambiguous, and that no judicial construction is called for. In such event the unequivocal language is to be given its plain meaning and enforced as written. Allen v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 460, 463. However, for the purposes of this opinion we shall consider the language to be fairly susceptible to different constructions, and for that reason we shall look to the circumstances, the purposes of the provision, and the context in which used in order to ascertain the intent of the parties. Wilson v. Owen, Mo., 261 S.W.2d 19, 23.

In the two contracts forming the complete agreement between the parties, it was provided that plaintiffs should "pay all costs of * * * *development* of said lands for sale to the public." The construction placed by the defendants on this duty of plaintiffs is at least some evidence as to the construction which should be placed on the provision in the following paragraph that plaintiffs "shall have complete control * * * over the *development* and sale of said lands." Landau v. Laughren, Mo., 357 S.W.2d 74. We find no contention that the term "development" as used in connection with the payment of the costs should not include the cost of platting the

island and drafting the restrictions and conditions. At least there was no offer by defendants to pay what would be their share under their theory. Aside from this, however, when all the terms are read together and paragraph 2 is considered in context, we find that the agreement of the parties included the following. Plaintiffs were to pay all the costs for developing the land for sale by lots. This included the cost of locating and building roads, surveying and subdividing the land into lots, and the cost of determining and preparing the restrictions on the use of the land. These were the essential activities necessary to prepare, that is, develop the land so that lots could be made available and attractive to potential purchasers. In carrying on these acts of development, plaintiffs were to have complete control with no hindrance from any party, which included defendants, except as otherwise provided in the agreement. We find that it was otherwise provided that plaintiffs' complete control was to be limited in the following respects: (1) they could sell lots for residential purposes only, (2) they could not sell lots fronting on the lake for a price less than $18 per lake front foot unless defendants agreed or unless the price was set by the named arbiter, (3) they could not enter into any lease or option agreement in connection with the sale of the lots, (4) they could not cause assessments to be made against any lot which would place a cloud on the title or constitute a lien or encumbrance, (5) they could not sell certain designated lots reserved to defendants, (6) they were to meet and confer with defendants about property valuations, and (7) "should any dispute arise between [plaintiffs and defendants] in connection with the subject matter of this contract [dated August 4, 1959] and the parent contract above referred to [dated July 21, 1959], that such dispute shall be referred to John F. Low, * * * and he shall act as sole arbiter in said dispute, and his decision shall be binding on all parties hereto." We find no statement as to whether the arbitration provision was complied with, and if not,

why not. We assume the parties have waived it, or have agreed that it is not applicable.

Mr. Low testified that the provisions of paragraph 2 of the contract dated July 21, 1959 were fully and completely discussed by the parties during the negotiations, and some of the restrictions set out above on the exercise of complete control by the plaintiffs were included at the suggestion of Mr. Uskali. The substance of defendants' testimony is that the provision was discussed, but that they did not then understand that plaintiffs' right extended beyond the right to sell the lots without their interference. The purpose of the provision is obvious, and the reasonableness of it and the necessity for responsibility and control over such matters not to be spread among several persons is best demonstrated by what happened in this case when defendants assumed the authority to veto the decisions of plaintiffs and their surveyor and engineer. Mr. Parish testified that he insisted during negotiations on having control over the location of the road, the surveying and the subdividing "because I certainly wasn't going to put up my money and have somebody else do the developing." There was, in our opinion, a complete and full understanding of the provision, its purpose and its effect, and there is no equitable or legal reason why this court should rewrite the contract by judicial interpretation to express a meaning different from that which is obvious from the words used, and different from the meaning when the provision is considered in context, in connection with its purpose, and in view of the attending circumstances. Defendants understandingly sold to plaintiffs this right of control over the development of Big Island, subject to the expressed limitations, for what we consider to have been an adequate and legal consideration, and we see no reason why they should be excused from their bargain. What we have said does not, of course, mean that plaintiffs have the right to be arbitrary and unreasonable in the

exercise of their control, but defendants have not demonstrated arbitrary and unreasonable action, and their contentions on this appeal are not directed to that but to the proposition that they and not plaintiffs have the ultimate right of control. Defendants' third point is without merit.

We find no error prejudicial to defendants, and the judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.